**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 23 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

NORMAN LAW, ANDREW GREER,
PETER HERRMANN, MICHAEL
JARVIS, JR., and CHARLES M.
RIEB, individually and on behalf of
others similarly situated,

     Plaintiffs-Appellees,

v.

NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,

     Defendant-Appellant,

and

WILLIAM HALL,

     Amicus Curiae.

No. 96-3034

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 94-2053-KHV)**

---

William C. Barnard (Gayle A. Reindl, Donald C. Biggs and Mary T. Doherty of
Sommer & Barnard, Indianapolis, Indiana; John J. Kitchin and Linda J. Salfrank
of Swanson, Midgley, Gangwere, Kitchin & McLarney, Kansas City, Missouri,
with him on the briefs) for Defendant-Appellant.

W. Dennis Cross (Lori R. Schultz of Morrison & Hecker, Kansas City, Missouri; Robert G. Wilson of Cotkin & Collins, Los Angeles, California; and Gerald I. Roth, Allentown, Pennsylvania, with him on the briefs) for Plaintiffs-Appellees.

Leonard B. Simon, Jan M. Adler, Dennis Stewart and Bonny E. Sweeney of Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, California; R. Lawrence Ward, Phillip W. Bledsoe of Shugart, Thomson, & Kilroy, Kansas City, Missouri; and Steven Beldsoe, Overland Park, Kansas of Shugart, Thomson, & Kilroy, on the brief for the Amicus Curiae.

---

Before **EBEL**, **LOGAN,** and **KELLY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Defendant-Appellant the National Collegiate Athletic Association ("NCAA") promulgated a rule limiting annual compensation of certain Division I entry-level coaches to $16,000. Basketball coaches affected by the rule filed a class action challenging the restriction under Section 1 of the Sherman Antitrust Act. The district court granted summary judgment on the issue of liability to the coaches and issued a permanent injunction restraining the NCAA from promulgating this or any other rules embodying similar compensation restrictions. The NCAA now appeals, and we affirm.

## I. Background

The NCAA is a voluntary unincorporated association of approximately 1,100 educational institutions. [1] The association coordinates the intercollegiate athletic programs of its members by adopting and promulgating playing rules, standards of amateurism, standards for academic eligibility, regulations concerning recruitment of student athletes, rules governing the size of athletic squads and coaching staffs, and the like. The NCAA aims to "promote opportunity for equity in competition to assure that individual student-athletes and institutions will not be prevented unfairly from achieving the benefits inherent in participation in intercollegiate athletics."

The NCAA classifies sports programs into separate divisions to reflect differences in program size and scope. NCAA Division I basketball programs are generally of a higher stature and have more visibility than Division II and III basketball programs. Over 300 schools play in Division I, and each Division I member hires and employs its own basketball coaches.

During the 1980s, the NCAA became concerned over the steadily rising costs of maintaining competitive athletic programs, especially in light of the requirements imposed by Title IX of the 1972 Education Amendments Act to

---

[1] Because this appeal stems from the grant of a motion for summary judgment, we review the facts taken in the light most favorable to the NCAA, the non-moving party. See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).

increase support for women's athletic programs. The NCAA observed that some college presidents had to close academic departments, fire tenured faculty, and reduce the number of sports offered to students due to economic constraints. At the same time, many institutions felt pressure to "keep up with the Joneses" by increasing spending on recruiting talented players and coaches and on other aspects of their sports programs in order to remain competitive with rival schools. In addition, a report commissioned by the NCAA known as the "Raiborn Report" found that in 1985 42% of NCAA Division I schools reported deficits in their overall athletic program budgets, with the deficit averaging $824,000 per school. The Raiborn Report noted that athletic expenses at all Division I institutions rose more than 100% over the eight-year period from 1978 to 1985. Finally, the Report stated that 51% of Division I schools responding to NCAA inquiries on the subject suffered a net loss in their basketball programs alone that averaged $145,000 per school.

Part of the problem identified by the NCAA involved the costs associated with part-time assistant coaches. The NCAA allowed Division I basketball teams to employ three full-time coaches, including one head coach and two assistant coaches, and two part-time coaches. The part-time positions could be filled by part-time assistants, graduate assistants, or volunteer coaches. The NCAA imposed salary restrictions on all of the part-time positions. A volunteer coach

could not receive any compensation from a member institution's athletic department. A graduate assistant coach was required to be enrolled in a graduate studies program of a member institution and could only receive compensation equal to the value of the cost of the educational experience (grant-in-aid) depending on the coach's residential status (i.e. a non-resident graduate assistant coach could receive greater compensation to reflect the higher cost of out-of-state tuition than could an in-state student). The NCAA limited compensation to part-time assistants to the value of full grant-in-aid compensation based on the value of out-of-state graduate studies.

Despite the salary caps, many of these part-time coaches earned $60,000 or $70,000 per year. Athletic departments circumvented the compensation limits by employing these part-time coaches in lucrative summer jobs at profitable sports camps run by the school or by hiring them for part-time jobs in the physical education department in addition to the coaching position. Further, many of these positions were filled with seasoned and experienced coaches, not the type of student assistant envisioned by the rule.

In January of 1989, the NCAA established a Cost Reduction Committee (the "Committee") to consider means and strategies for reducing the costs of intercollegiate athletics "without disturbing the competitive balance" among NCAA member institutions. The Committee included financial aid personnel,

inter-collegiate athletic administrators, college presidents, university faculty members, and a university chancellor. In his initial letter to Committee members, the Chairman of the Committee thanked participants for joining "this gigantic attempt to save intercollegiate athletics from itself." It was felt that only a collaborative effort could reduce costs effectively while maintaining a level playing field because individual schools could not afford to make unilateral spending cuts in sports programs for fear that doing so would unduly hamstring that school's ability to compete against other institutions that spent more money on athletics. In January of 1990, the Chairman told NCAA members that the goal of the Committee was to "cut costs and save money." It became the consensus of the Committee that reducing the total number of coaching positions would reduce the cost of intercollegiate athletic programs.

The Committee proposed an array of recommendations to amend the NCAA's bylaws, including proposed Bylaw 11.6.4 that would limit Division I basketball coaching staffs to four members--one head coach, two assistant coaches, and one entry-level coach called a "restricted-earnings coach".[2] The

---

[2] Bylaw 11.6.4 provided in pertinent part:

Number Limits. There shall be a limit on the number of coaches that may be employed by an institution in each sport (other than football) as follows: Sport: Basketball, Men; Head or Assistant Coach: 3; Restricted-Earnings Coach: 1.

restricted-earnings coach category was created to replace the positions of part-time assistant, graduate assistant, and volunteer coach.[3]  The Committee believed that doing so would resolve the inequity that existed between those schools with graduate programs that could hire graduate assistant coaches and those who could not while reducing the overall amount spent on coaching salaries.

A second proposed rule, Bylaw 11.02.3, restricted compensation of restricted-earnings coaches in all Division I sports other than football to a total of $12,000 for the academic year and $4,000 for the summer months (the "REC Rule" for restricted-earnings coaches).[4]  The Committee determined that the

_____

[3]  The proposed rule included a "grandfather clause" exempting schools from the staffing limitations where academic tenure, enforceable written contracts, or formal security-of-employment commitments would make it impossible to comply with such limits.

[4]  Bylaw 11.02.3 provided:

Restricted-Earnings Coach.  A restricted-earnings coach is any coach who is designated by the institution's athletics department to perform coaching duties and who serves in that capacity on a volunteer or paid basis with the following limitations on earnings derived from the member institution:
(a)     During the academic year, a restricted-earnings coach may receive compensation or remuneration from the institution's athletics department that is not in excess of either $12,000 or the actual cost of educational expenses incurred as a graduate student.
(b)     During the summer, a restricted-earnings coach may receive compensation or remuneration (total remuneration shall not exceed $4,000) from:
(1)     The institution's athletics department or any organization funded in whole or in part by the athletics department or that is involved primarily in the promotion of the institution's

(continued...)

- 7 -

$16,000 per year total figure approximated the cost of out-of-state tuition for graduate schools at public institutions and the average graduate school tuition at private institutions, and was thus roughly equivalent to the salaries previously paid to part-time graduate assistant coaches. The REC Rule did allow restricted-earnings coaches to receive additional compensation for performing duties for another department of the institution provided that (1) such compensation is commensurate with that received by others performing the same or similar assignments, (2) the ratio of compensation received for coaching duties and any

---

[4](...continued)
        athletics program (e.g., booster club, athletics foundation association);

    (2)    The institution's camp or clinic,

    (3)    Camps or clinics owned or operated by institutional employees, or

    (4)    Another member institution's summer camp.

(c)    During the summer or the academic year, the restricted-earnings coach may receive compensation for performing duties for another department or office of the institution, provided:

    (1)    The compensation received for those duties outside the athletic department is commensurate with that received by others performing those same or similar assignments,

    (2)    The ratio of compensation received for coaching duties and any other duties is directly proportionate to the amount of time devoted to the two areas of assignment, and

    (3)    The individual is qualified for and is performing the duties outside the athletic department for which the individual is compensated.

(d)    Compensation for employment from a source outside the institution during the academic year or from sources other than those specified under 11.02.3-(b) and 11.02.3-(c) above during the summer shall be excluded from the individual's limit on remuneration.

other duties is directly proportional to the amount of time devoted to the two areas of assignment, and (3) the individual is qualified for and actually performs the duties outside the athletic department for which the individual is compensated. The REC Rule did not prevent member institutions from using savings gained by reducing the number and salary of basketball coaches to increase expenditures on other aspects of their athletic programs.

Supporting adoption of the REC Rule, the Committee stated:

> The largest expense item in the athletics budget is personnel. Currently, only football and basketball have limits on the number of coaches who may be employed, and the existing categorical designations of part-time graduate student and volunteer coach have not been effective in reducing the number of full-time paid employees associated with the sport. In addition, the committee recognizes the recent proliferation of part-time personnel associated with many Division I sports.
> Proposed limitations reflect an effort to (1) reduce the number of coaches associated with each sport by at least one full-time-equivalent position; (2) establish an "unrestricted" head or assistant coach category that will accommodate any type of volunteer, paid, full-time or part-time coach; and (3) establish a "restricted earnings" category that will encourage the development of new coaches while more effectively limiting compensation to such coaches.

"Report of the NCAA Special Committee on Cost Reduction," Part Two, ¶ 1.

The NCAA adopted the proposed rules, including the REC Rule, by majority vote in January of 1991, and the rules became effective on August 1, 1992.[5] The rules bind all Division I members of the NCAA that employ

---

[5] Other cost-saving measures were adopted that, _inter alia_, limited:
\* the number of coaches who could recruit off campus.

(continued...)

basketball coaches. The schools normally compete with each other in the labor market for coaching services.

In this case, plaintiffs-appellees were restricted-earnings men's basketball coaches at NCAA Division I institutions in the academic year 1992-93. They challenged the REC Rule's limitation on compensation under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1990), as an unlawful "contract, combination . . . or conspiracy, in restraint of trade." They did not challenge other rules promulgated by the NCAA, including the restriction on the number of coaches. The district court exercised jurisdiction pursuant to 28 U.S.C. § 1337 (1993)[6] and 15 U.S.C. §§ 15 and 26 (1982).[7]

---

[5](...continued)
* off-campus contacts with prospective student-athletes.
* visits by prospective student-athletes.
* printed recruiting materials.
* the number of practices before the first scheduled game.
* the number of games and duration of seasons.
* team travel and training table meals.
* financial aid grants to student-athletes.

[6] 28 U.S.C. § 1337 provides in relevant part:

(a) The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

[7] 15 U.S.C. § 15 provides in relevant part:

(a) Except as provided in subsection (b) of this section [regarding foreign states], any person who shall be injured in his business or property by

(continued...)

- 10 -

The district court addressed the issue of liability before addressing issues of class certification and damages. Ruling on cross-motions for summary judgment, the court found the NCAA liable for violating section 1. Following the ruling, an administrative committee of the NCAA rescinded the compensation limits. However, the rescission was subject to ratification by NCAA members at their January 1996 meeting, and the appellate record does not reflect that such ratification ever occurred. Prior to the meeting, a new rule was proposed that would have eliminated the restricted-earnings coach position and replaced it with a position having similar compensation restrictions. On January 5, 1996, the district court, pursuant to 15 U.S.C. § 26, permanently enjoined the NCAA from enforcing or attempting to enforce any restricted-earnings coach salary limitations against the named plaintiffs, and it further enjoined the NCAA from "reenacting

---

[7](...continued)
reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 26 provides in relevant part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws.

the compensation limitations embodied in [the REC Rule]."  The NCAA appeals

the permanent injunction.

## II.  Summary Judgment Review

Although this is an interlocutory appeal, we have appellate jurisdiction

pursuant to 28 U.S.C. § 1292(a)(1) (1993) because the NCAA seeks review of an

order granting a permanent injunction.[8]  In reviewing the injunction, we may also

address the summary judgment order that served as the district court's principal

legal basis for granting the injunction because the district court's ruling on

summary judgment was inextricably intertwined with its ruling granting a

permanent injunction.  See Tri-State Generation & Transmission Ass'n, Inc. v.

Shoshone River Power, Inc., 874 F.2d 1346, 1351 (10th Cir. 1989); see also

Moore v. City of Wynnewood, 57 F.3d 924, 930 (10th Cir. 1995) (court may

consider pendent jurisdiction appeals beyond those authorized for interlocutory

appeal if the issues are inextricably intertwined) (citing Swint v. Chambers

County Comm'n, 115 S. Ct. 1203, 1212 (1995)) .

Typically, we review a district court's grant of an injunction for abuse of

discretion.  See United States v. Jenks, 22 F.3d 1513, 1519 (10th Cir. 1994).

---

[8]  The relevant part of 28 U.S.C. § 1292(a) provides:

[T]he courts of appeals shall have jurisdiction of appeals from:
(1) Interlocutory orders of the district courts . . . granting . . .
injunctions.

However, in this case, the NCAA challenges only that part of the injunction finding that it violated antitrust law.[9]  The district court relied on its prior order granting summary judgment for that issue.  We review de novo a summary judgment which serves as a basis for an injunction.  See id. at 1517.

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court.
> While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.  If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant.

Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996) (quoting Wolf v. Prudential Ins. Co. of America., 50 F.3d 793, 796 (10th Cir. 1995) (further citations omitted)).

---

[9]  The NCAA does not challenge other portions of the order, such as the finding that a remedy at law would be insufficient.

### III. Rule of Reason Analysis

Section 1 of the Sherman Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  Because nearly every contract that binds the parties to an agreed course of conduct "is a restraint of trade" of some sort, the Supreme Court has limited the restrictions contained in section 1 to bar only "unreasonable restraints of trade." NCAA v. Board of Regents, 468 U.S. 85, 98 (1984); see also Standard Oil Co. v. United States, 221 U.S. 1, 52-60 (1911).  To prevail on a section 1 claim under the Sherman Act, the coaches needed to prove that the NCAA (1) participated in an agreement that (2) unreasonably restrained trade in the relevant market.  See Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 959 (10th Cir. 1990).  The NCAA does not dispute that the REC Rule resulted from an agreement among its members.  However, the NCAA does contest the district court's finding that on the record before it, there was no genuine dispute of fact that the REC Rule is an unreasonable restraint of trade.

Two analytical approaches are used to determine whether a defendant's conduct unreasonably restrains trade:  the *per se* rule and the rule of reason.  See SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 963 (10th Cir. 1994).  The *per se* rule condemns practices that "are entirely void of redeeming competitive

rationales." Id. Once a practice is identified as illegal *per se*, a court need not examine the practice's impact on the market or the procompetitive justifications for the practice advanced by a defendant before finding a violation of antitrust law. Rule of reason analysis, on the other hand, requires an analysis of the restraint's effect on competition. See National Soc'y of Prof'l Engineers v. United States, 435 U.S. 679, 695 (1978). A rule of reason analysis first requires a determination of whether the challenged restraint has a substantially adverse effect on competition. See SCFC, 36 F.3d at 965; United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993). The inquiry then shifts to an evaluation of whether the procompetitive virtues of the alleged wrongful conduct justifies the otherwise anticompetitive impacts. See Brown Univ., 5 F.3d at 669. The district court applied the rule of reason standard to its analysis of the REC Rule.

Horizontal price-fixing is normally a practice condemned as illegal *per se*. See FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 436 n.19 (1990) ("horizontal price-fixing . . . has been consistently analyzed as a *per se* violation for many decades"); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940). By agreeing to limit the price which NCAA members may pay for the services of restricted-earnings coaches, the REC Rule fixes the cost of one of the component items used by NCAA members to produce the product of Division I basketball. As a result, the REC Rule constitutes the type of naked horizontal

agreement among competitive purchasers to fix prices usually found to be illegal *per se*. See, e.g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 235 (1948) (complaint alleging conspiracy among sugar refiners to purchase sugar-beets at agreed-upon prices sufficient to survive a motion for dismissal because the challenged conduct is precisely the type of activity condemned by section 1 of the Sherman Act); National Macaroni Mfrs. Ass'n v. FTC, 345 F.2d 421, 426-27 (7th Cir. 1965) (agreement among macaroni producers to limit amount of premium priced durum wheat purchased and to substitute specified percentage of inferior wheat in finished macaroni *per se* illegal because effect of restriction was effectively to reduce price of durum wheat that had risen as a result of a recent shortage).

However, the Supreme Court recognized in Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc., 441 U.S. 1, 23 (1979), that certain products require horizontal restraints, including horizontal price-fixing, in order to exist at all. Faced with such a product--the ASCAP blanket music license which could not exist absent an agreement among artists to sell their rights at uniform prices-- the Court held that a rule of reason analysis should be applied to the restraint. Id. at 24.

Subsequently, the Supreme Court in NCAA v. Board of Regents departed from the general treatment given to horizontal price-fixing agreements by refusing

to apply a *per se* rule and instead adopting a rule of reason approach in reviewing

an NCAA plan for televising college football that involved both limits on output

and price-fixing.  See 468 U.S. at 99-103.  The Court explained:

> Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an "illegal *per se*" approach because the probability that these practices are anticompetitive is so high; a *per se* rule is applied "when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output."  In such circumstances a restraint is presumed unreasonable without inquiry into the particular market context in which it is found.  Nevertheless, we have decided that it would be inappropriate to apply a *per se* rule to this case.  This decision is not based on a lack of judicial experience with this type of arrangement, on the fact that the NCAA is organized as a nonprofit entity, or on our respect for the NCAA's historic role in the preservation and encouragement of intercollegiate amateur athletics.  <u>Rather, what is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all</u>.

468 U.S. at 100-101 (quoting <u>Broadcast Music</u>, 441 U.S. at 19-20) (footnotes

omitted and emphasis added).

The "product" made available by the NCAA in this case is college

basketball; the horizontal restraints necessary for the product to exist include

rules such as those forbidding payments to athletes and those requiring that

athletes attend class, etc.  See <u>id.</u> at 101-02 (what a sports league and its members

"market . . . is competition itself . . . . Of course, this would be completely

ineffective if there were no rules . . . to create and define the competition to be

marketed.").  Because some horizontal restraints serve the procompetitive purpose

- 17 -

of making college sports available, the Supreme Court subjected even the price and output restrictions at issue in <u>Board of Regents</u> to a rule of reason analysis. <u>See</u> <u>id.</u> at 103; <u>see</u> <u>also</u> <u>Hairston v. Pacific 10 Conference</u>, 101 F.3d 1315, 1318-19 (9th Cir. 1996) (employing rule of reason analysis and finding that imposing sanctions for violations of NCAA rules did not violate section 1 of the Sherman Act); <u>Banks v. NCAA</u>, 977 F.2d 1081, 1088-94 (7th Cir. 1992) (upholding no-draft and no-agent eligibility rules for student athletes under rule of reason analysis); <u>Justice v. NCAA</u>, 577 F. Supp. 356, 379-82 (D. Ariz. 1983) (NCAA sanctions against member institution imposed for violations of NCAA rule barring compensation of student athletes did not violate antitrust laws under rule of reason analysis).

Other courts also have applied a rule of reason analysis to sports league rules, <u>see</u> I ABA Section of Antitrust Law, <u>Antitrust Law Developments</u> 115-16 (4th ed. 1997) (citing cases), including restraints otherwise given *per se* treatment, <u>see, e.g.,</u> <u>M&H Tire Co., Inc. v. Hoosier Racing Tire Corp.</u>, 733 F.2d 973, 980 (1st Cir. 1984) (applying rule of reason standard to a rule requiring all auto racing competitors to use the same tire and stating that "in the sports area various agreed-upon procedures may be essential to survival"). <u>See also</u> Phillip E. Areeda, <u>Antitrust Law</u> ¶ 1478d, at 359 (1986) (noting that courts "have

not woodenly applied the *per se* prohibitions developed for ordinary business situations" to sports leagues).

Plaintiff coaches cite the Supreme Court's refusal to create exceptions to the *per se* treatment of price-fixing schemes in cases such as <u>Superior Court Trial Lawyers</u> and <u>Arizona v. Maricopa County Medical Soc'y</u>, 457 U.S. 332, 342 (1982), and urge us to apply a *per se* analysis to the NCAA rule at issue in this case. Since neither case dealt with a "product" such as college sports that requires horizontal restraints to exist, the cases are not persuasive here in light of the Supreme Court's analysis of NCAA price-fixing under a rule of reason in <u>Board of Regents</u>.

The coaches also argue that <u>Board of Regents</u> is distinguishable because the agreement in that case went to marketing the product itself--college sports--and because that agreement was closer to a joint venture because it involved a "joint selling arrangement." By contrast, they contend (1) that the hiring of coaches involves the market for coaching services, an input, rather than college sports, the output, and (2) that the price-fixing at issue in this case does not involve "joint buying" because each school independently hires its own coaches. The second point does not distinguish this case from <u>Board of Regents</u>. In <u>Board of Regents</u>, like the present case, each school negotiated <u>individually</u> with television networks

within the constraints of price agreements. <u>See</u> 468 U.S. at 93.[10] The first point is similarly unpersuasive. <u>Board of Regents</u> does not turn on whether the agreement in question is based on input components or output products. Rather, <u>Board of Regents</u> more generally concluded that because horizontal agreements are necessary for sports competition, all horizontal agreements among NCAA members, even those as egregious as price-fixing, should be subject to a rule of reason analysis.[11] <u>See</u> 468 U.S. at 101-03.

Finally, the Supreme Court has made it clear that the *per se* rule is a "demanding" standard that should be applied only in clear cut cases. <u>See</u> <u>Continental T.V., Inc. v. GTE Sylvania Inc.</u>, 433 U.S. 36, 50 (1977); <u>accord</u> <u>Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.</u>, 382 U.S. 172, 178 (1965) ("[T]he area of *per se* illegality is carefully limited."). As a result, courts consistently have analyzed challenged conduct under the rule of reason when

---

[10] In several instances, the NCAA tries to style itself as a joint venture, arguing that joint ventures are entitled to more favorable treatment under the antitrust laws. However, the Supreme Court rejected categorizing the NCAA as a joint venture with respect to the television rights plan challenged in <u>Board of Regents</u> because the plan did not "eliminate individual sales of broadcasts, since these still occur, albeit subject to fixed prices and output limitations." 468 U.S. at 113. Here, the NCAA does not hire coaches for the teams. Rather the teams hire coaches individually, "albeit subject to fixed prices." Thus, the NCAA does not operate as a joint venture for the purposes of hiring assistant basketball coaches. As a result, we do not consider the question of how joint ventures should be treated under the antitrust laws.

[11] Albeit often an abbreviated rule of reason analysis, as discussed below.

dealing with an industry in which some horizontal restraints are necessary for the availability of a product, even if such restraints involve horizontal price-fixing agreements. See I ABA Section of Antitrust Law, supra, at 49 (citing cases). Thus, we apply the rule of reason approach in this case.

Courts have imposed a consistent structure on rule of reason analysis by casting it in terms of shifting burdens of proof. See I ABA Section of Antitrust Law, supra, at 53 (citing cases). Under this approach, the plaintiff bears the initial burden of showing that an agreement had a substantially adverse effect on competition. See Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 56 (2d Cir. 1997); Hairston, 101 F.3d at 1319; Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 (3d Cir. 1996); Brown Univ., 5 F.3d at 668; see also I ABA Section of Antitrust Law, supra, at 53, 55 (citing cases); Areeda, supra, ¶ 1502, at 371-72. If the plaintiff meets this burden, the burden shifts to the defendant to come forward with evidence of the procompetitive virtues of the alleged wrongful conduct. See Clorox, 117 F.3d at 56; Hairston, 101 F.3d at 1319; Orson, 79 F.3d at 1367-68; Brown Univ., 5 F.3d at 669; see also I ABA Section of Antitrust Law, supra, at 53, 66 (citing cases); Areeda, supra, ¶ 1502, at 372. If the defendant is able to demonstrate procompetitive effects, the plaintiff then must prove that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less

restrictive manner. See Clorox, 117 F.3d at 56; Hairston, 101 F.3d at 1319; Orson, 79 F.3d at 1368; Brown Univ., 5 F.3d at 669; I ABA Section of Antitrust Law, supra, at 53, 66. Ultimately, if these steps are met, the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable. See Areeda, supra, ¶ 1502, at 372.

### A. Anticompetitive Effect

We first review whether the coaches in this case demonstrated anticompetitive effect so conclusively that summary judgment on the issue was appropriate. A plaintiff may establish anticompetitive effect indirectly by proving that the defendant possessed the requisite market power within a defined market or directly by showing actual anticompetitive effects, such as control over output or price. See Orson, 79 F.3d at 1367; Brown Univ., 5 F.3d at 668-69; Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1413 (9th Cir. 1991). A naked, effective restraint on market price or volume can establish anticompetitive effect under a truncated rule of reason analysis. See Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n, 961 F.2d 667, 674 (7th Cir. 1992) (approving application of "quick look" rule of reason analysis that dispensed with market definition and assessment of market power in a case involving an output restriction established by the National Basketball Association).

The NCAA argues that the district court erred by failing to define the relevant market and by failing to find that the NCAA possesses power in that market. The NCAA urges that the relevant market in this case is the entire market for men's basketball coaching services,[12] and it presented evidence demonstrating that positions as restricted-earnings basketball coaches make up, at most, 8% of that market. Thus, the NCAA argues it has at least created a genuine issue of material fact about whether it possesses market power and that summary judgment was therefore inappropriate.

The NCAA misapprehends the purpose in antitrust law of market definition, which is not an end unto itself but rather exists to illuminate a practice's effect on competition. In Board of Regents, the Court rejected a nearly identical argument from the NCAA that a plan to sell television rights could not be condemned under the antitrust laws absent proof that the NCAA had power in the market for television programming. See 468 U.S. at 109. "As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output. To the contrary, when there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" Id. (quoting National Soc'y of

---

[12] According to the NCAA, the relevant market would include, in addition to coaching positions in Division I schools, coaching positions in Division II and III schools, junior colleges, high schools, and professional teams.

Prof'l Engineers, 435 U.S. at 692). No "proof of market power" is required where the very purpose and effect of a horizontal agreement is to fix prices so as to make them unresponsive to a competitive marketplace. See id. at 110. Thus, where a practice has obvious anticompetitive effects--as does price-fixing--there is no need to prove that the defendant possesses market power. Rather, the court is justified in proceeding directly to the question of whether the procompetitive justifications advanced for the restraint outweigh the anticompetitive effects under a "quick look" rule of reason. See Chicago Prof'l Sports, 961 F.2d at 674.

We find it appropriate to adopt such a quick look rule of reason in this case. Under a quick look rule of reason analysis, anticompetitive effect is established, even without a determination of the relevant market, where the plaintiff shows that a horizontal agreement to fix prices exists, that the agreement is effective, and that the price set by such an agreement is more favorable to the defendant than otherwise would have resulted from the operation of market forces. See Gary R. Roberts, The NCAA, Antitrust, and Consumer Welfare, 70 Tul. L. Rev. 2631, 2636-39 (1996) (citing Board of Regents, 468 U.S. at 109-10). Under this standard, the undisputed evidence supports a finding of anticompetitive effect. The NCAA adopted the REC Rule to reduce the high cost of part-time coaches' salaries, over $60,000 annually in some cases, by limiting compensation to entry-level coaches to $16,000 per year. The NCAA does not

dispute that the cost-reduction has effectively reduced restricted-earnings coaches' salaries. Because the REC Rule was successful in artificially lowering the price of coaching services, no further evidence or analysis is required to find market power to set prices. Thus, in the case at bar, the district court did not need to resolve issues of fact pertaining to the definition of the relevant market in order to support its decision on summary judgment that the REC Rule is a naked price restraint.

The NCAA contends that the district court misapplied Board of Regents, a case in which the Court had before it detailed factual findings that resulted from a trial. The NCAA is right about the procedural posture of Board of Regents, but wrong about its significance. In Board of Regents the Supreme Court relied on the district court's findings that the television plan in fact resulted in horizontal price restraints. See 468 U.S. at 99-100. Because the REC Rule is a horizontal price restraint on its face, similar factual findings are not required in this case. Further, although in Board of Regents the Court found that the parties had proven factually that the NCAA had market power in the defined market of college football, the Court said that as a matter of law it did not need to analyze market power because horizontal price restraints are so obviously anticompetitive. Id. at 109-10.

Finally, the NCAA cites Hennessey v. NCAA, 564 F.2d 1136 (5th Cir. 1977) (per curiam). In Hennessey, assistant football and basketball coaches challenged a NCAA bylaw limiting the number of assistant coaches member institutions could employ at any one time. See id. at 1141-42. The Fifth Circuit upheld the rule, concluding that the plaintiff failed to show that the rule was an unreasonable restraint of trade after weighing the anticompetitive effects with the procompetitive benefits of the restriction. See id. at 1153-54.

Hennessey is not controlling for a variety of reasons. First, the REC Rule is distinguishable from the agreement at issue in Hennessey. Hennessey addresses a restriction on the number of assistant coaches that a Division I school could employ whereas the REC Rule limits salary of a certain category of coaches. Therefore, the analysis of the reasonableness of the restraint in Hennessey, which did not involve a naked restriction on price, will not control the analysis of the reasonableness of the REC Rule.[13]

Second, the Hennessey court placed the burden of showing the unreasonableness of the coaching restriction in that case on the plaintiff and then found that the plaintiff could not make such a showing because the rule had only recently been implemented. See id. In our analysis, the plaintiff only has the

_____

[13] Indeed, plaintiffs do not challenge the restrictions on the number of coaches included in the NCAA's bylaws.

burden of establishing the anticompetitive effect of the restraint at issue. Once the plaintiff meets that burden, which the coaches have done in this case by showing the naked and effective price-fixing character of the agreement, the burden shifts to the defendant to justify the restraint as a "reasonable" one. See I ABA Section of Antitrust Law, supra, at 66 (citing cases). It is on this step that the defendant NCAA stumbles. Thus, we disagree with the Fifth Circuit's allocation of the burden of proof in Hennessey, and we note that this shift in the burden of proof could explain the difference in outcome between our case and Hennessey.

Third, Hennessey predates the Supreme Court's opinion in Board of Regents. The Fifth Circuit very well may have reached a different result in Hennessey if it had the benefit of that precedent, because Board of Regents suggests a less deferential approach to the NCAA than the approach taken in Hennessey. Finally, of course, Hennessey is not Tenth Circuit precedent, and accordingly is not binding authority on us.

## B. Procompetitive Rationales

Under a rule of reason analysis, an agreement to restrain trade may still survive scrutiny under section 1 if the procompetitive benefits of the restraint justify the anticompetitive effects. See Clorox, 117 F.3d at 56; Hairston, 101 F.3d at 1319; Orson, 79 F.3d at 1368; Brown Univ., 5 F.3d at 669; see also I ABA

Section of Antitrust Law, supra, at 53, 66; Areeda, supra, ¶ 1502, at 371-72. Justifications offered under the rule of reason may be considered only to the extent that they tend to show that, on balance, "the challenged restraint enhances competition." Board of Regents, 468 U.S. at 104.

In Board of Regents the Supreme Court recognized that certain horizontal restraints, such as the conditions of the contest and the eligibility of participants, are justifiable under the antitrust laws because they are necessary to create the product of competitive college sports. Id. at 117. Thus, the only legitimate rationales that we will recognize in support of the REC Rule are those necessary to produce competitive intercollegiate sports. The NCAA advanced three justifications for the salary limits: retaining entry-level coaching positions; reducing costs; and maintaining competitive equity. We address each of them in turn.

### 1. Retention of Entry-Level Positions

The NCAA argues that the plan serves the procompetitive goal of retaining an entry-level coaching position. The NCAA asserts that the plan will allow younger, less experienced coaches entry into Division I coaching positions. While opening up coaching positions for younger people may have social value apart from its affect on competition, we may not consider such values unless they impact upon competition. See Superior Court Trial Lawyers, 493 U.S. at 423-24

(rejecting argument by trial lawyers that boycott of court-appointed work was justified to promote the social value of increasing the quality of representation); FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 462-64 (1986) (refusing to consider ethical policy of insuring proper dental care as a valid procompetitive end); Board of Regents, 468 U.S. at 117 (rejecting justifications offered to support a challenged restraint that do not promote competition as "inconsistent with the basic policy of the Sherman Act"); National Soc'y of Prof'l Engineers, 435 U.S. at 695-96 (holding that policy goals such as protecting public safety and promoting ethical behavior do not qualify as legitimate procompetitive objectives unless they serve to "regulate and promote" competition); see also Areeda, supra, ¶ 1504, at 381 (courts should "not inquire whether the restraint promotes the 'public interest' but only whether it increases competition.").[14]

The NCAA also contends that limiting one of the four available coaching positions on a Division I basketball team to an entry level position will create more balanced competition by barring some teams from hiring four experienced coaches instead of three. However, the REC Rule contained no restrictions other

_____

[14] Similarly, the NCAA cannot be heard to argue that the REC Rule fosters the amateurism that serves as the hallmark of NCAA competition. While courts should afford the NCAA plenty of room under the antitrust laws to preserve the amateur character of intercollegiate athletics, see Banks, 977 F.2d at 1089-93, courts have only legitimized rules designed to ensure the amateur status of student athletes, not coaches.

than salary designed to insure that the position would be filled by entry-level applicants; it could be filled with experienced applicants. In addition, under the REC Rule, schools can still pay restricted-earnings coaches more than $16,000 per year by hiring them for physical education or other teaching positions. In fact, the evidence in the record tends to demonstrate that at least some schools designated persons with many years of experience as the restricted-earnings coach. The NCAA did not present any evidence showing that restricted-earnings positions have been filled by entry-level applicants or that the rules will be effective over time in accomplishing this goal. Nothing in the record suggests that the salary limits for restricted-earnings coaches will be effective at creating entry-level positions. Thus, the NCAA failed to present a triable issue of fact as to whether preserving entry-level positions served a legitimate procompetitive end of balancing competition.

### 2. Cost Reduction

The NCAA next advances the justification that the plan will cut costs. However, cost-cutting by itself is not a valid procompetitive justification. If it were, any group of competing buyers could agree on maximum prices. Lower prices cannot justify a cartel's control of prices charged by suppliers, because the cartel ultimately robs the suppliers of the normal fruits of their enterprises. See Areeda, supra, ¶ 1504, at 379. Further, setting maximum prices reduces the

incentive among suppliers to improve their products. Likewise, in our case, coaches have less incentive to improve their performance if their salaries are capped. As the Supreme Court reiterated in Superior Court Trial Lawyers, 493 U.S. at 423, "the Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. . . This judgment recognizes that all elements of a bargain--quality, service, safety, and durability--and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers." (internal quotations omitted).

The NCAA adopted the REC Rule because without it competition would lead to higher prices. The REC Rule was proposed as a way to prevent Division I schools from engaging in behavior the association termed "keeping up with the Joneses," i.e., competing. However, the NCAA cannot argue that competition for coaches is an evil because the Sherman Act "precludes inquiry into the question whether competition is good or bad." National Soc'y of Prof'l Engineers, 435 U.S. at 695.

While increasing output, creating operating efficiencies, making a new product available, enhancing product or service quality, and widening consumer choice have been accepted by courts as justifications for otherwise anticompetitive agreements, mere profitability or cost savings have not qualified

as a defense under the antitrust laws.  See I ABA Section of Antitrust Law, supra, at 66-67 (citing cases).  The NCAA's cost containment justification is illegitimate because the NCAA:

> [I]mproperly assumes that antitrust law should not apply to condemn the creation of market power in an input market.  The exercise of market power by a group of buyers virtually always results in lower costs to the buyers--a consequence which arguably is beneficial to the members of the industry and ultimately their consumers.  If holding down costs by the exercise of market power over suppliers, rather than just by increased efficiency, is a procompetitive effect justifying joint conduct, then section 1 can never apply to input markets or buyer cartels.  That is not and cannot be the law.

Roberts, supra, at 2643.  Reducing costs for member institutions, without more, does not justify the anticompetitive effects of the REC Rule.

The NCAA argues that reducing costs can be considered a procompetitive justification because doing so is necessary to maintain the existence of competitive intercollegiate sports.  Emphasizing the deficits many college sports programs faced prior to the adoption of the REC Rule, the NCAA quotes with approval language from the opinion in Hennessey to support its claim that reducing costs serves as a procompetitive benefit:

> Colleges with more successful programs, both competitively and economically, were seen as taking advantage of their success by expanding their programs, to the ultimate detriment of the whole system of intercollegiate athletics.  Financial pressures upon many members, not merely to "catch up", but to "keep up," were beginning to threaten both the competitive, and the amateur, nature of the programs, leading quite possibly to abandonment by many.  "Minor" and "minority" sports were viewed as imperiled by concentration upon the "money makers," such as varsity football and basketball.

Bylaw 12-1 [the rule at issue in Hennessey] was, with other rules adopted at the same time, intended to be an "economy measure". In this sense it was both in design and effect one having commercial impact. But the fundamental objective in mind was to preserve and foster competition in intercollegiate athletics-by curtailing, as it were, potentially monopolistic practices by the more powerful-and to reorient the programs into their traditional role as amateur sports operating as part of the educational process.

564 F.2d at 1153.

We are dubious that the goal of cost reductions can serve as a legally sufficient justification for a buyers' agreement to fix prices even if such cost reductions are necessary to save inefficient or unsuccessful competitors from failure. Nevertheless, we need not consider whether cost reductions may have been required to "save" intercollegiate athletics and whether such an objective served as a legitimate procompetitive end because the NCAA presents no evidence that limits on restricted-earning coaches' salaries would be successful in reducing deficits, let alone that such reductions were necessary to save college basketball. Moreover, the REC Rule does not equalize the overall amount of money Division I schools are permitted to spend on their basketball programs. There is no reason to think that the money saved by a school on the salary of a restricted-earnings coach will not be put into another aspect of the school's basketball program, such as equipment or even another coach's salary, thereby increasing inequity in that area. Accord Board of Regents, 468 U.S. at 118-19 (rejecting NCAA's argument that television rights plan would increase

- 33 -

competitive equity among NCAA teams where the plan did not "regulate the amount of money that any college may spend on its football program").

### 3. Maintaining Competitiveness

We note that the NCAA must be able to ensure some competitive equity between member institutions in order to produce a marketable product: a "team must try to establish itself as a winner, but it must not win so often and so convincingly that the outcome will never be in doubt, or else there will be no marketable 'competition.'" Michael Jay Kaplan, Annotation, Application of Federal Antitrust Laws to Professional Sports, 18 A.L.R. Fed. 489 § 2(a) (1974). The NCAA asserts that the REC Rule will help to maintain competitive equity by preventing wealthier schools from placing a more experienced, higher-priced coach in the position of restricted-earnings coach. The NCAA again cites Hennessey to support its position, and again we find Hennessey to be unpersuasive for the reasons previously articulated.

While the REC Rule will equalize the salaries paid to entry-level coaches in Division I schools, it is not clear that the REC Rule will equalize the experience level of such coaches.[15] Nowhere does the NCAA prove that the salary

---

[15] For example, some more-experienced coaches may take restricted-earnings coach positions with programs such as those at Duke or North Carolina, despite the lower salary, because of the national prominence of those programs. In fact, absent the REC Rule, the market might produce greater equity in coaching talent, because a school with a less-prominent basketball program might be able

(continued...)

restrictions enhance competition, level an uneven playing field, or reduce coaching inequities. Rather, the NCAA only presented evidence that the cost reductions would be achieved in such a way so as to maintain without "significantly altering," "adversely affecting," or "disturbing" the existing competitive balance. The undisputed record reveals that the REC Rule is nothing more than a cost-cutting measure and shows that the only consideration the NCAA gave to competitive balance was simply to structure the rule so as not to exacerbate competitive imbalance. Thus, on its face, the REC Rule is not directed towards competitive balance nor is the nexus between the rule and a compelling need to maintain competitive balance sufficiently clear on this record to withstand a motion for summary judgment.[16]

### 4. Wait and See

---

[15](...continued)
to entice a more-experienced coach away from a prominent program by offering a higher salary.

[16] Because we hold that the NCAA did not establish evidence of sufficient procompetitive benefits, we need not address question of whether the plaintiffs were able to show that comparable procompetitive benefits could be achieved through viable, less anticompetitive means. See I ABA Section of Antitrust Law, supra, at 66 (collecting cases); Areeda, supra, ¶ 1502, at 372 (if the defendant proves procompetitive justifications, the plaintiff must demonstrate that less restrictive means could have been used to achieve the same results to prevail under the rule of reason analysis).

In the alternative, the NCAA argues that even if evidence of the procompetitive benefits of the REC Rule are not forthcoming at the moment, we should follow the advice of the court in Hennessey and adopt a "wait and see" approach to give the rule time to succeed. See 564 F.2d at 1153-54 (refusing to place the burden on the NCAA to prove that the procompetitive benefits of the challenged restraint in that case outweighed its negative effects because doing so would "foreclose . . . any opportunity to build up experience on which the issue ultimately could be judged"). However, we believe that the court in Hennessey erred as a matter of law to the extent that the court tried to free the NCAA as the defendant from its burden of showing that the procompetitive justifications for a restraint on trade outweigh its anticompetitive effects. The Supreme Court in Board of Regents made it clear that the NCAA still shoulders that burden, see 486 U.S. at 104, and we hold that the NCAA failed to provide sufficient evidence to carry its burden in this case.

## IV. Conclusion

For the reasons discussed above, we AFFIRM the district court's order granting a permanent injunction barring the NCAA from reenacting compensation limits such as those contained in the REC Rule based on its order granting summary judgment to the plaintiffs on the issue of antitrust liability.