**Timothy MELLON, Plaintiff,**

v.

**THE CESSNA AIRCRAFT COMPANY, Defendant.**

**No. 96–1454–JTM.**

United States District Court, D. Kansas.

July 2, 1998.

Daniel D. Crabtree, Stinson, Mag & Fizzell, P.C., Overland Park, KS, John H. Broadley, David A. Handzo, Steven N Berk, Thomas D. Amrine, Jenner & Block, Washington, DC, for plaintiff.

P. John Owen, Morrison & Hecker L.L.P., Kansas City, MO, John C. Nettels, Jr., Morrison & Hecker L.L.P., Wichita, KS, Michael E. Tucci, Morrison & Hecker L.L.P., Washington, DC, for defendant.

### MEMORANDUM ORDER

MARTEN, District Judge.

Timothy Mellon sued Cessna Aircraft Company, alleging Cessna's policy of refusing to service Cessna manufactured aircraft with modifications unapproved by Cessna violates Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. Mellon also asserts a promissory estoppel claim under state law.

Mellon moved for summary judgment on the promissory estoppel claim. Cessna moved for summary judgment on all claims. On May 18, 1998, the court denied the parties' cross motions for summary judgment on the estoppel claim. Cessna's motion for summary judgment on the antitrust claims was taken under advisement. The court is now prepared to rule.

### I. Summary Judgment Standard.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to show that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the initial showing has been made, the burden shifts to the non-moving party to designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. A party may not rely on the allegations of its pleadings but must establish the existence of a genuine issue of material fact through admissible evidence. *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1490 (10th Cir.1995), *cert. denied,* 516 U.S. 1160, 116 S.Ct. 1045, 134 L.Ed.2d 192 (1996). When determining whether there is a material issue of fact, the nonmoving party's evidence is to be believed; all justifiable inferences are to be drawn in its favor; and

its nonconclusory version of any disputed issue of fact is assumed to be correct. *Multistate Legal Studies, Inc. v. Harcourt Brace Publ., Inc.*, 63 F.3d 1540, 1545 (10th Cir. 1995), *cert. denied,* 516 U.S. 1044, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996).

## II. Facts.

The following factual scenario is based on the relevant factual assertions of the parties, where supported by citations to admissible evidence and with all reasonable inferences drawn in Mellon's favor.[1]

### A. Mellon's Purchase of the Plane and the Service Letter.

Cessna has manufactured a variety of business jet aircraft, including the Model 501SP "Citation I" owned by Mellon, as well as the model 525 "CitationJet." Mellon purchased his jet in May 1989, for $1,333,500.

A major reason Mellon decided to purchase the Cessna was that it was a jet with single-pilot capability. Mellon refused to consider a Falcon 10 as it was not capable of single-pilot flight without a modification and Mellon thought the modification was not feasible. Mellon refused to consider non-jet aircraft.

Another factor in Mellon's decision to purchase the plane was the availability of service and inspections at Cessna-owned Citation service centers.[2] The pre-purchase inspection of the plane was conducted at Cessna's Citation service center in Orlando. From the time he purchased the plane until September 1995, Mellon regularly brought the plane to Cessna's company-owned Citation service center in Newburgh, New York, particularly for major maintenance and "phase inspections" required by the Federal Aviation Administration (FAA).

Before Mellon purchased the plane, it had been serviced by providers other than Cessna. Prior to September 1995, Mellon also had the plane serviced by other service providers and on one occasion by a Cessna-authorized service center in Germany.

In the Spring of 1992, Mellon began to consider having his citation modified by installing an Eagle 400 modification manufactured by Sierra Industries, Inc. Before deciding whether to purchase the Eagle 400 modification, Mellon asked Charles Knapp, the acting general manager of Cessna's Newburgh service center, if Cessna would continue to perform major maintenance and phase inspections on the aircraft if Mellon had the plane equipped with the Eagle 400 modification.[3]

Knapp told Mellon he would check with Cessna management in Wichita and get back to him. Knapp asked one or more Cessna employees in Wichita or elsewhere whether Cessna would continue to service Mellon's plane if the Eagle 400 modification was installed. Knapp reported back to Mellon that he had consulted with Cessna management in Wichita and Cessna would continue to service the plane if Mellon had the Eagle 400 modification installed. Mellon purchased the modification from Sierra Industries and it was installed by Sierra in Texas.

Cessna issued Service Letter SL500–03–01 on September 22, 1995. The text of the letter provides:

---

1. Cessna's statement of facts contains interpretations of governmental regulations. However, Mellon does not dispute Cessna's interpretations, so the court treats these interpretations as accurate for summary judgment purposes.

   In its reply brief, Cessna objects to Mellon's practice of stating the fact which he wishes to infer from the evidence, then identifying the evidence which he claims supports the inference. Cessna argues this practice violates D.Kan.R. 56.1 and asks the court to disregard all such inferences. The court does not consider Mellon's practice to be in violation of the local rule. Where the cited facts reasonably support the inference, the court presumes, as it must in the summary judgment stage, that Mellon's inference is true. Mellon's approach actually makes it easier for the court to evaluate the significance of the cited facts and the reasonableness of the inference. The court notes that Cessna followed a similar practice. *See e.g.,* Cessna's Statement of Undisputed Facts ¶¶ 48, 49, 104.

2. Cessna cites other factors Mellon considered, as well as other planes. This does not mean that Mellon did not consider the availability of Cessna service as a factor.

3. Cessna purports to contradict this assertion, but instead makes other factual assertions which do not contradict Mellon's assertion that he asked Knapp whether Cessna would continue to perform major maintenance and phase inspections on the plane if he had it modified.

This service letter transmits information to owners/operators regarding the Supplemental Type Certificate (STC) process affecting Cessna Citation aircraft. The STC is an FAA approved change to aircraft within FAA jurisdiction. STCs that are developed by Cessna, or that are purchased and installed by Cessna, are covered by Cessna warranty and will be supported by Cessna.

STCs that are developed without Cessna involvement and engineering approval will not be supported by Cessna. The STC holder for the particular installation is expected to accept responsibility for the warranty and product support for the installation on Citation aircraft. It is recommended that operators who are contemplating an STC installation, address the support issue directly with the STC holder prior to installation.

Citation aircraft that have installed STCs that permit performance and/or alter limitations outside the Cessna FAA Approved Flight Manual may be refused service at Cessna service centers.

Cessna-owned service centers will not provide support in the way of installation, spare parts, repair, inspection or warranty for STCs not approved by Cessna.

When Cessna issued the Service Letter, it issued similar letters on all other models of jet aircraft it manufactures.

Under Federal Aviation Regulations (FARs), for a manufacturer to obtain a Type Certificate (TC) from the Federal Administration (FAA), it must first submit a type design, which includes the drawings and specifications necessary to define the configuration and design features of the aircraft, and information on the dimensions, materials and processes necessary to define its structural strength.

A Supplemental Type Certificate (STC) is issued by the FAA to someone other than an original manufacturer of an airplane to certify that a modification to the original type design complies with the regulations applicable to the modification. Mellon's Citation I is equipped with two STCs: the Eagle and the Eagle 400.

James E. Morgan, Cessna's Vice President for Service Facilities, testified that he believes over 100 Cessna 500/501 series Citations are equipped with Eagle or Eagle 400 modifications. Prior to the issuance of the Service Letter, Cessna serviced between 5 and 10 of these planes.

Mellon's expert testified a plane comparable to Mellon's is worth about $50,000 less than it would otherwise be worth if all phase inspections and major maintenance had been performed at a Cessna-owned service center. Mellon and prior owners had the plane serviced at non-Cessna-owned service facilities. However, Cessna does not allege that prior to the issuance of the Service Letter, phase inspections or major maintenance were performed at non-Cessna-owned service facilities.

Upon issuance of the Service Letter, Cessna-owned service centers initially refused to provide any service to modified Citations.[4] When Mellon complained about the Service Letter, Cessna offered to arrange for service at Cessna-authorized service centers.

In June 1997, after Mellon filed this lawsuit, Cessna issued a policy revision indicating that modified Citations were no longer "totally excluded" from Cessna-owned service centers.

Since the Service Letter was issued, Mellon has had his plane serviced as much as possible by Cessna. Sierra has serviced his plane and both Cessna and Sierra have performed phase inspections. Mellon also has obtained service at other non-Cessna service centers.

B. The Market.

The parties agree that the geographical market for new and used business jets is worldwide. Mellon defines the relevant antitrust market for aircraft as business jets, new and used, that can be flown by a single pilot. Cessna admits its Models 500 and 501, including those with STC modifications, are part of the competition in Cessna's efforts to sell the CitationJet. Sales of the CitationJet

---

4. Cessna disputes this fact, but Mellon has cited admissible evidence from which it is reasonable to conclude that Cessna initially refused to provide any service to modified aircraft.

increased after the Service Letter was issued.

Cessna disputes Mellon's market definition, and relying on testimony from Cessna officials and retained experts, contends the following planes are competitors of the CitationJet:

(1) Cessna Models 500, 501SP, 525, 550, S-550, 551 and 560, which are jet aircraft which can be flown by a single pilot crew.

. (2) The Lear 31 and the Beech Jet 400–A, which are jets but cannot be flown by a single pilot.

(3) King Air 90s, King Air 200s, King Air 300s and the Beech Starship, which can be flown by a single pilot, but are turbo props.

When attempting to sell CitationJets, Cessna targets owners of turboprops, Citation Models 500, 501, and 525, and Lear Models 23 and 24. Cessna is the only manufacturer of business jets that, as built by the manufacturer, can be certified by the FAA to be flown by a single pilot. Other manufacturers have such planes under development. Raytheon is taking orders aggressively for the single-pilot business jet it is developing, the Premier I.

Cessna's market surveys indicate that most of the competition for the sale of the Citation Jet comes from used Citations. The surveys also indicate that single-pilot capability was listed as an important factor for purchasers of the CitationJet, ranging from a low of 12% in 1991 to a high of 48% in 1996. Cessna also conducted a survey which showed less than 10% of the Cessna fleet was flown single pilot.

Mellon's expert witness testified that there is a discrete market for single-pilot jet aircraft. He testified that he had 33 years experience in the aircraft industry and had been involved in more than 1000 aircraft sales transactions. Cessna objects to the report's conclusions because it contains no analysis of reasonable substitution or interchangeability. Cessna's damages expert testified that, in his experience, 5 to 7 percent of aircraft purchasers are only interested in single-pilot jet aircraft.

Cessna sells approximately 60 CitationJets each year. About 10 used CitationJets are sold each year. About three Citations with Eagle modifications are sold each year. About nine Citations are equipped with Sierra modifications each year. In the absence of the Service Letter, the president of Sierra Industries believes his sales would have been greater. He testified that prior to the issuance of the Service Letter, he had a healthy backlog of orders. At the time of his deposition, he had only two long-wing modifications pending, and no Eagle or Eagle 400 orders.

Cessna service for major maintenance and phase inspections costs substantially more than such service from other providers.

The original developer of the Sierra Modification STC went bankrupt. A subsequent owner of the rights to the STC went out of business. Sierra Industries is the present owner of the rights to the STC.

The FAA has not issued any Air Worthiness Directives (AWDs) or taken any other action indicating that Citations equipped with Sierra Modifications are unsafe or have long-term safety problems. Cessna's expert witness testified that he saw no safety-related issues involved in servicing modified aircraft and that his own service center continues to service such aircraft. Sierra Industries offered to provide Cessna with the technical specifications of the modified aircraft and, prior to the issuance of the Service Letter, worked closely with Cessna when technical questions arose.

Prior to the issuance of the Service Letter, some Cessna employees felt comfortable servicing modified Citations and were willing to continue servicing the modified aircraft. Also prior to the issuance of the Service Letter, the manager of Cessna's Newburg facility asked the sales and marketing manager to determine how much income the center would lose if it stopped servicing modified Citations. After the Service Letter was issued, Cessna employees provided different justifications for the Service Letter. Cessna refuses to certify the airworthiness of modified aircraft and will not accept modified aircraft as a trade-in when purchasing a new CitationJet.

III. Analysis.

Mellon claims that Cessna violated Section 2 of the Sherman Act by monopolizing or

attempting to monopolize the market for single-pilot business jets. He argues Cessna violated Section 1 of the Sherman Act by tying Cessna service to the purchase of non-modified Cessna aircraft.

■ The offense of monopoly under Section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. *Eastman Kodak Co. v. Image Technical Services,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

■ A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different, or tied, product, or at least agrees that he will not purchase that product from any other supplier. Such an arrangement violates Section 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market. *Kodak,* 504 U.S. at 461–62, 112 S.Ct. 2072.

Cessna first argues both of Mellon's antitrust claims fail because he lacks standing to assert them. Cessna then argues Mellon's Section 2 monopoly claim fails because he cannot show the existence of a legally cognizable and relevant market for jet aircraft in which Cessna possesses monopoly power. Next, Cessna argues Mellon cannot establish that its conduct was intended to preserve or create monopoly power in a relevant market, thus Mellon's Section 2 claim fails. Cessna argues Mellon's Section 1 tying claim fails because he cannot show Cessna possesses market power in the tying market, service for Cessna Citations, sufficient to impact the tied market. Finally, Cessna argues injunctive relief is inappropriate under the facts of this case, and since Mellon does not seek monetary damages in his antitrust claims, Cessna is entitled to summary judgment. Each argument will be addressed in turn.

### A. Standing.

■ Cessna first argues that Mellon lacks standing to bring his antitrust claims. The Clayton Act authorizes private actions to enforce the antitrust laws. 15 U.S.C. §§ 15 and 26. To establish standing to bring an enforcement action seeking injunctive relief under Section 26, a plaintiff must show (1) an antitrust injury; and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws. *Reibert v. Atlantic Richfield Co.,* 471 F.2d 727, 730–31 (10th Cir.) (applying test to claims brought under Sections 15 and 26), *cert. denied,* 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973). *See also Sports Racing Services, Inc. v. Sports Car Club of America, Inc.,* 131 F.3d 874, 882 (10th Cir.1997) (applying test to claim for treble damages under Section 15).

■ *Sports Racing* explained how the two factors are evaluated. To show an antitrust injury, a plaintiff must show an injury of the type which the antitrust laws were intended to prevent and which flow from the reason that the defendant's conduct is prohibited. 131 F.3d at 882. To meet the second prong of the test, the plaintiff must show the injury resulted directly from the defendant's violation. *Id. Sports Racing* identified six factors to be considered when evaluating antitrust standing:

> (1) the causal connection between the alleged antitrust violation and the harm; (2) improper motive or intent of defendants; (3) whether the claimed injury is one sought to be redressed by antitrust damages; (4) the directness between the injury and the market restraint resulting from the alleged violation; (5) the speculative nature of the damages claimed; and (6) the risk of duplicative recoveries or complex damage apportionment.

*Sports Racing,* 131 F.3d at 882 (quoting *City of Chanute, Kan. v. Williams Natural Gas Co.,* 955 F.2d 641, 652 n. 14 (10th Cir.), *cert. denied,* 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992), *overruled in part on other grounds, Systemcare, Inc. v. Wang Lab. Corp.,* 117 F.3d 1137 (10th Cir.1997)(en banc)). *Sports Racing* recognized that standing analysis must take into account the type of antitrust claim being asserted. 131 F.3d at 882.

Cessna sets forth all of the factors listed by the Tenth Circuit and cites a number of cases where a plaintiff was found not to have standing to assert an antitrust claim. However, Cessna presents only two arguments, both of which address the fourth factor listed by the Tenth Circuit: whether Mellon can establish damages related to Cessna's allegedly illegal conduct.

■ Cessna first argues Mellon cannot show an injury as a result of Cessna's conduct because his plane was serviced by providers other than Cessna prior to the issuance of the Service Letter. Cessna cites Mellon's expert's testimony that an owner voluntarily having major maintenance or phase inspections performed by another provider would suffer the same damages. Cessna ignores the fact that Mellon's expert clearly emphasized the importance of major maintenance and phase inspections, as opposed to routine maintenance. Cessna cites no evidence, and does not even argue, that Mellon's plane received either major maintenance or phase inspections from other providers prior to the issuance of the Service Letter. Cessna's arguments therefore go to the amount of damages Mellon suffered as a result of Cessna's conduct, rather than the existence of such damages. For summary judgment purposes, Mellon can establish that he suffered damages related to Cessna's conduct.

■ Cessna next argues Mellon is an inappropriate plaintiff because he regularly flies his plane internationally. Cessna has no company-owned service centers outside the United States. Cessna argues this would regularly place Mellon in a position where he would have to use non-Cessna service. While Cessna cites some instances where Mellon's plane received service outside the United States, Cessna does not cite any instances where Mellon's plane received major maintenance or phase inspections outside the United States. Cessna does not argue that Mellon would have to schedule major maintenance or phase inspections outside the United States. At the summary judgment stage all reasonable inferences must be drawn in Mellon's favor. In the absence of evidence to the contrary, it is reasonable to assume Mellon could schedule all major maintenance and phase inspections to occur while his plane was in the United States. Thus, the fact that Mellon flies his plane internationally does not mean that he would be unable to show damages.

The court finds it unnecessary to address the other five factors of *Sports Racing*, where Cessna does not even argue that any of the other factors weigh against conferring standing under the facts of this case. Cessna has the burden of establishing that it is entitled to summary judgment and the court will not construct arguments on its behalf. This would be unfair to Mellon, who would have no opportunity to respond to such arguments. Accordingly, Mellon has standing to assert his antitrust claims.

**B. Relevant Market for Jet Aircraft.**

Mellon argues the relevant market for his Section 2 claim is business jets that can be flown by a single pilot and that Cessna possesses monopoly power in that market. Cessna argues (1) Mellon has defined the market too narrowly, and (2) Mellon cannot show Cessna has monopoly power in the relevant market, regardless of which definition is used. Cessna argues that Mellon has the burden of establishing the relevant market and that Cessna has market power in that market.

■ The purpose in antitrust law of market definition is to illuminate a practice's effect on competition, rather than as an end unto itself. *Law v. National Collegiate Athletic Assoc.*, 134 F.3d 1010, 1020 (10th Cir. 1998). *Accord, Allen–Myland, Inc. v. International Business Machines Corp.*, 33 F.3d 194, 209 (3rd Cir.)("Market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them.") (citations omitted), *cert. denied*, 513 U.S. 1066, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994). What Mellon must actually do is present a reasonable economic theory with citations to evidence indicating the theory accurately reflects the market. *Kodak*, 504 U.S. at 468–69, 112 S.Ct. 2072. If Mellon cites evidence of anti-competitive effects, to obtain summary judgment Cessna has the burden of showing that an inference

of market power is unreasonable. *Id.*, 504 U.S. at 468–69, 471, 112 S.Ct. 2072.

▮▮▮▮ *Law* held that it is not necessary for a plaintiff to establish market power where a plaintiff directly shows anti-competitive effects, such as control over output or price. *Law*, 134 F.3d at 1019–21. In *Law*, the Tenth Circuit found evidence that the NCAA imposed a cap on salaries for certain assistant coaches at member schools was sufficient to show anti-competitive effects. It was not necessary for the plaintiffs to present an elaborate demonstration of the relevant market. *Id.* As discussed below, for summary judgment purposes Mellon has established a relevant product market and produced direct evidence of anti-competitive effects. While Mellon's evidence of anti-competitive effects is not as direct as that presented in *Law*, *Law* is important because it illustrates the perspective from which the definition of relevant market must be established.

In *Kodak*, the defendant was a manufacturer of complex business machines and also serviced the machines. Other manufacturers of similar machines existed. However, parts for the machines were not interchangeable. The plaintiff cited evidence that the defendant restricted access to parts for other service providers, that customers switched to the defendant's service, and that some service providers went out of business as a result. The Supreme Court held this was sufficient evidence to raise a material question of fact for the jury. *Kodak*, 504 U.S. at 460, 112 S.Ct. 2072.

Here, Mellon cited evidence that Cessna recognizes sales of used Citations, particularly those with performance modifications, as the major competition for sales of new CitationJets. He cited evidence of increased sales of CitationJets after the Service Letter was issued. He cited evidence of decreased sales of modifications to existing Citations. Finally, he cited evidence that the market value for modified used Citations decreased as a result of Cessna's refusal to provide service and support for modified aircraft. Mellon has cited evidence of anti-competitive effects. Accordingly, to obtain summary judgment Cessna must show that an inference of market power is unreasonable.

Cessna argues that Mellon has failed to take into account reasonable interchangeability of use and the cross elasticity of demand between CitationJets and alternative aircraft, citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022 (10th Cir.), *cert. denied*, 506 U.S. 999, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1385, 140 L.Ed.2d 645 (1998); *Allen–Myland, supra; Tower Air, Inc. v. Federal Exp. Corp.*, 956 F.Supp. 270 (E.D.N.Y.1996); and *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162 (S.D.N.Y.1995). Cessna claims that the market, as defined by Mellon, is tailored to his own personal preferences.

Cessna argues a number of single-pilot aircraft, as well as non-single pilot aircraft, compete with the Cessna Citation and should be included in the market definition, including turbo-prop aircraft, modified multi-pilot business jets, multi-pilot business jets, and single-pilot jet aircraft in design by other manufacturers. Cessna cites evidence supporting this argument. Cessna claims that when these other aircraft are considered, Cessna has less than 48% of the market. However, Cessna merely raises a question of material fact. Mellon's personal preferences happen to coincide with what Cessna's own marketing materials indicate are the characteristics of the CitationJet's major competition. Cessna has not established that Mellon's suggested market definition is unreasonable as a matter of law. Under Mellon's definition of the relevant market, Cessna controls approximately 73% of the market. This is sufficient to show market power for summary judgment purposes. *See Kodak*, 504 U.S. at 481, 112 S.Ct. 2072 (citing cases). The cases Cessna cites are distinguishable and do not support Cessna's position.

In *Brown Shoe*, the government sought to block a merger between two shoe companies under 15 U.S.C. § 18. The Supreme Court reasoned that the proper way to define the relevant markets was with regard to the

facts of the actual market. The district court made factual findings and divided the market into three lines of shoes: men's, women's, and children's shoes. The Supreme Court rejected attempts by the shoe companies to further subdivide the market before considering whether the proposed merger would substantially impact competition. *Brown Shoe,* 370 U.S. at 323–28, 82 S.Ct. 1502. The Court held that because there was no difference in the competitive effects of the merger when so subdivided, further subdivision was impractical and unwarranted. *Id.,* 370 U.S. at 327–28, 82 S.Ct. 1502.

Here, Mellon's action is brought pursuant to 15 U.S.C. § 2 and the motion is one for summary judgment rather than a review of rulings based on findings of fact. Furthermore, here there is evidence the competitive effects are different if the market is subdivided.

In *TV Communications,* a cable TV operator sued a cable television source provider. The operator alleged the provider had a monopoly over a single cable television station. The district court granted a motion to dismiss. The Tenth Circuit held an antitrust claim could not be based on a natural monopoly a company holds over its own product. 964 F.2d 1022. To the extent that Cessna argues *TV Communications* stands for the proposition that a single brand of a product or service can never define a relevant market, *Kodak* explicitly rejected this position. *Kodak,* 504 U.S. at 481–82, 112 S.Ct. 2072. Furthermore, the *TV Communications'* court noted that it could not consider whether the defendant had a monopoly in broader markets, such as subscription television programming or sports programming, but was limited to considering the allegations of the complaint. Here, Mellon does not allege that Cessna monopolized or was trying to monopolize the market in CitationJets. He alleges Cessna was trying to monopolize the market in single-pilot jet aircraft.

In *Queen City,* Domino's Pizza and its franchisees entered into a contract agreement. The franchisees alleged that Domino's Pizza was using contract provisions to force the franchisees to purchase supplies from it at supracompetitive prices. The franchisees sought to limit the market to supplies for Domino's franchisees. The Third Circuit rejected this approach, holding that the relevant market must include supplies for all pizza shops because such supplies were interchangeable. The court emphasized that a supplier's exercise of contractual restraints is not necessarily equivalent to the exercise of monopoly power. *Queen City,* 124 F.3d at 436–39. The court distinguished *Kodak* because the franchisees failed to allege that the supplies at issue were unique. *Id.* 124 F.3d at 439. Here, as discussed above, Cessna has merely raised a material question of fact as to whether a single-pilot jet aircraft forms a unique market.

In *Allen–Myland,* the plaintiff, AMI, reconfigured IBM mainframe computers by installing module upgrades which increased the processing power of the computers. The modules were purchased directly from IBM or from customers who had purchased upgrades from AMI. IBM instituted a policy bundling installation with the price of the modules and requiring that replaced modules be returned to IBM.

AMI sought to define the relevant market as large-scale mainframe computers. Alternatively, AMI sought to limit the market to parts and services for upgrading IBM mainframes or all manufacturer's mainframes. Instead, the district court expanded the relevant market to include various substitutes that it believed shared cross-elasticity of demand with large-scale mainframe computers.

The Third Circuit rejected a number of the additions because they amounted to double counting. It rejected the addition of used IBM equipment because IBM had too much control over that market. It rejected the addition of memory and other internal upgrades because they were not reasonably interchangeable with processor upgrades. The Third Circuit then vacated factual findings that small computers, peripheral devices and software upgrades competed with processor upgrades. On remand, the district court was referred to *Kodak* and directed to consider evidence that high switch-over costs might effectively prevent small computers from competing with mainframe upgrades. With regard to peripheral devices and software, the Third Circuit found the evidence on which the district court relied was insuffi-

cient to support its findings, but noted that the district court was free to consider additional evidence on remand. Finally, the Third Circuit found there was sufficient evidence to support the district court's rejection of AMI's proposed submarkets. *Allen–Myland,* 33 F.3d at 201–209.

*Allen–Myland* does not support Cessna's position. The thrust of the decision is that a detailed factual inquiry must be conducted. Similarly, *Tower Air* found that summary judgment was inappropriate where a definition of the relevant market could not be made based solely upon the undisputed facts. *Tower Air,* 956 F.Supp. at 281–282.

In *B.V. Optische,* the plaintiff failed to plead that the market for certain chest X-ray equipment was not interchangeable with the general market for X-ray equipment. *B.V. Optische,* 909 F.Supp. at 171–172. Here, Mellon has plead and cited evidence in support of his argument that the single-pilot jet aircraft market is the relevant market.

A material question of fact exists as to the relevant product market and Cessna's power in that market. Accordingly, Cessna is not entitled to summary judgment on Mellon's Section 2 antitrust claim.

C. Intent to Preserve Monopoly Power.

█ Cessna argues that Mellon's Section 2 claim fails because he cannot show that Cessna issued the Service Letter with the intent to preserve monopoly power in the market for single-pilot jet aircraft.

█ Cessna first argues that Mellon cannot point to any "smoking-gun" statements from Cessna executives, thus he cannot establish intent to monopolize. However, intent may be established by circumstantial evidence, including evidence of a negative impact on competition. *See Kodak,* 504 U.S. at 483, 112 S.Ct. 2072 (where plaintiff presented evidence that Kodak took actions to preserve its monopoly, liability will turn on whether legitimate business reasons can explain Kodak's actions). Cessna also points to the self-serving statements of its officials that they were not concerned with sales of modified aircraft and had a neutral position on modifications. It is reasonable to infer from Cessna's marketing reports that Cessna did consider used Citations, including modi-

fied Citations, as competition. It also is reasonable to infer from the decision not to service modified aircraft that Cessna was not neutral on the issue of whether the aircraft should be modified.

Mellon has presented circumstantial evidence from which it is reasonable to infer that Cessna was motivated by an intent to eliminate modified aircraft as competition to the CitationJet. He cited evidence that various Cessna officials offered different justifications for the Service Letter. Cessna explains this away by arguing that all of the stated reasons were factors in issuing the Service Letter. This may well be true, but a reasonable fact finder could conclude otherwise. Mellon cited evidence from which it is reasonable to infer that no legitimate safety concerns exist, thus negating the main reason proffered for the issuance of the Service Letter.

Cessna then argues that Mellon's theory is economically unfeasible because Cessna would forego sales opportunities by turning away service customers. Cessna cites no evidence indicating the impact of its decision on sales, or on the amount of sales that occur as a result of maintenance service. Mellon cites evidence that Cessna's sales of the CitationJet increased and that the value of used-modified Citations decreased after the Service Letter was issued. This suggests that Mellon's theory is economically reasonable.

█ Cessna next argues that legitimate business concerns—customer safety and product integrity—prompted the Service Letter. As previously noted, Mellon has cited evidence that there are no legitimate safety concerns, including evidence that Sierra Industries cooperated with Cessna by providing technical data and assistance. With regard to product integrity, Mellon cited evidence that before the Service Letter was issued, Cessna had serviced modified aircraft for more than a decade.

Cessna next argues that its lack of market power in the service market means that it cannot have intended to restrict competition in the sales market. This argument fails because Mellon's monopoly claim is not based solely on the tying arrangement. Mellon also argues, and cites evidence in support,

that Cessna's decision not to service modified Citations sends a significant message to purchasers of single-pilot jet aircraft, i.e. that Cessna considers modified Citations unsafe.

Cessna next cites evidence of problems with modified Citations, including fuel leaks in Mellon's plane and difficulty obtaining technical information. Cessna also cites evidence that it issued similar service letters on other modified aircraft. This is evidence that Cessna may have been motivated by safety concerns. However, it merely indicates that a material question of fact exists.

■ Cessna next asserts that the court should consider the pro-competitive effects the Service Letter had on the service market. While pro-competitive effects may exist, Cessna cites no evidence from which the court can find, as a matter of law, that the pro-competitive effects outweigh the anti-competitive effects of the Service Letter.[5]

■ Finally, Cessna argues that Mellon's theory is irrational because the difference in price for a new CitationJet over a used Citation with modifications is so large that the lack of Cessna service is insufficient by itself to induce any rational buyer to spend the extra money on the CitationJet. This argument fails because Cessna's own marketing documents indicate that Cessna considers used Citations as the primary competition for the CitationJet. If the planes are in competition, then differences in service policies could indeed induce a potential buyer to purchase a CitationJet, rather than purchasing a used Citation with modifications or purchasing a modification for an existing Citation. This is especially true when Cessna's policy of refusing to accept modified aircraft for trade-in on a new CitationJet is considered.

Mellon has raised a material question of fact as to whether Cessna issued the Service Letter with an intent to preserve a monopoly on single-pilot jet business aircraft.

## D. Market Power in the Tying Market.

As previously noted, to establish a claim for tying in violation of Section 1 of the Sherman Act, Mellon must show Cessna has appreciable economic power in the tying product market, in this case the service market, and the arrangement affects a substantial volume of commerce in the tied market, in this case the market for single-pilot jet business aircraft. *Kodak*, 504 U.S. at 461–62, 112 S.Ct. 2072. Cessna argues that Mellon cannot show it has appreciable power in the service market.

As previously discussed, Mellon need only present a reasonable economic theory with citations to evidence indicating the theory accurately reflects the market. *Kodak*, 504 U.S. at 468–69, 112 S.Ct. 2072. If Mellon cites evidence of anti-competitive effects, to obtain summary judgment Cessna has the burden of showing that an inference of market power is unreasonable. *Id.*, 504 U.S. at 468–69, 471, 112 S.Ct. 2072. This applies to the tying market as well as the tied market. *See Kodak*, 504 U.S. at 481, 112 S.Ct. 2072 (noting that the burden of showing market power is lower in a Section 1 claim).

■ Cessna first argues that because Mellon claims Cessna has a monopoly in the tied market, he cannot show that any tying by Cessna had a substantial impact in the tied market. Cessna cites *Boddicker v. Arizona State Dental Association*, 680 F.2d 66, 67 (9th Cir.), *cert. denied*, 459 U.S. 837, 103 S.Ct. 83, 74 L.Ed.2d 79 (1982), as well as a number of other cases in support of this proposition. There are two problems with this argument. First, Cessna misstates the holding of *Boddicker* and the other published cases, which actually held that where there was no competition at all in the tied market, a tying claim was not viable. The court declines to consider the unpublished cases, where Cessna failed to provide copies. Furthermore, there are cases which have allowed both monopoly and tying claims to go to the fact finder. *See e.g. Kodak, supra.* Cessna's argument is not well taken.

Second, Mellon presents his tying claim in the alternative to his monopoly claim. Cessna vigorously argues that it does not have a monopoly in the tied market. If Cessna

**5.** Presumably, Cessna is arguing that the pro-competitive effects in the service area mean that Cessna cannot have intended to monopolize the sales area. Cessna does not even argue that the lost profit in the service area exceeds the profit gained from the alleged increase in sales attributable to the Service Letter.

prevails on this issue at trial, Mellon's tying claim would not be barred by a monopoly in the tied market, even if the court were to accept Cessna's argument as valid.

 Cessna next argues that because other companies service modified Cessnas, Cessna cannot be said to possess sufficient market power in the service market to impact the sales market. As discussed above, Mellon has cited evidence of anti-competitive effects in the tied market. Accordingly, Cessna must show Mellon's theory is unreasonable as a matter of law.

Cessna argues that because it controls less than 7% of the market for servicing Citations, it does not possess market power in the tying market. Mellon does not dispute that Cessna controls less than 7% of the general service market. He argues that Cessna factory service must be considered a separate sub-market—a market where Cessna has a complete monopoly. Mellon cites evidence that Cessna charges substantially more for phase inspections and other maintenance than other service providers and that owners are willing to pay this difference. Cessna's own economic expert testified that Cessna service is not the same as service obtained elsewhere. Mellon also cited evidence of the impact Cessna's refusal to service modified aircraft had on the value of such aircraft. The court cannot conclude as a matter of law that Cessna lacked market power in the tying market.

E. Appropriateness of Injunctive Relief.

 Cessna argues injunctive relief is inappropriate because Mellon has not alleged any damages that can be avoided through injunctive relief and because Cessna has legitimate safety concerns. The court has previously held that material questions of fact exist as to the amount of Mellon's damages and the safety justifications for Cessna's actions.

Mellon argues, and the court agrees, that it is reasonable to assume that a plane partially serviced by Cessna would suffer less loss in value than one receiving all its service elsewhere. Thus, it is possible that Mellon could obtain some actual relief through an injunction.

In addition, the court may find that Cessna has no legitimate safety concerns. If that turns out to be the case, the court may find injunctive relief appropriate. Accordingly, Cessna is not entitled to summary judgment because Mellon seeks only injunctive relief on his antitrust claims.