**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 27 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MICHAEL D. MITCHAEL, D.C.; CRAIG A.
FARNEY, D.C.; MARK E. RENO, D.C.;
DANIEL H. KELLY, D.C.; DOUGLAS J.
SCHOENHOFER, D.C.; CURTIS A.
WHEELER, D.C.; NATHAN E. HOLMAN,
D.C.; TIMOTHY D. BOLZ, D.C.; JAY
CARTER, D.C.; ROBERT L. DOPPS, D.C.;
DAVID MARTINEZ, D.C.; GARY S.
LARKIN, D.C.; KERRY L. COULTER,
D.C.; KATHRYN VAN WINKLE, D.C.;
LARRY THOMPSON, D.C.,

      Plaintiffs - Appellants,

MARK A. BECK, D.C., doing business as
BECK CHIROPRACTIC CLINICS; FRED
DOPPS, D.C.; BENJAMIN BOWERS, D.C.;
DANIEL DOPPS, D.C.; TODD FARNEY,
D.C.; JOEL JOHNSON, D.C.; BRAD
DOPPS, D.C.; JOHN DOPPS, D.C.; TERRY
L. FARNEY, D.C., individually and on
behalf of all others similarly situated,

      Plaintiffs/Counter-Defendants/
      Appellants,

    v.

INTRACORP, INC.,

      Defendant - Appellee,

No. 98-3038

FARM BUREAU MUTUAL INSURANCE
COMPANY, INC.; KFB INSURANCE
COMPANY, INC.; FARMERS INSURANCE
COMPANY, INC.; MID CENTURY
INSURANCE COMPANY; SHELTER
MUTUAL INSURANCE COMPANY;
SHELTER GENERAL INSURANCE
COMPANY; STATE FARM AUTOMOBILE
INSURANCE COMPANY; STATE FARM
FIRE AND CASUALTY COMPANY;
TRINITY UNIVERSAL INSURANCE
COMPANY OF KANSAS, INC.,

       Defendants/Counter-Claimants/
       Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. CV-94-1049-MLB)**

---

Susan R. Schrag, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kansas
(Robert W. Coykendall, Morris, Laing, Evans, Brock & Kennedy, Wichita,
Kansas; Ryan Hodge, Ray Hodge & Associates, Wichita, Kansas; Windell G.
Snow and Carolyn Sue Edwards, Wichita, Kansas, with her on the briefs), for
Appellants.

James D. Oliver (Jay F. Fowler and Mark A. Biberstein with him on the brief),
Foulston & Siefkin, L.L.P., Wichita, Kansas, for Appellee, Intracorp, Inc.

Heidi Dalenberg, Schiff Hardin & Waite, Chicago, Illinois (Richard L. Honeyman
and Donald N. Peterson II, Kahrs, Nelson, Fanning, Hite & Kellog, Wichita,
Kansas; David A. Morris, Stanford J. Smith, Jr., and Kenneth P. Leyba, Curfman,
Harris, Rose & Smith, L.L.P., Wichita, Kansas; Nicholas S. Daily, Depew &
Gillen, Wichita, Kansas; J. Stan Sexton, Hampton, Royce, Engleman & Nelson,
Salina, Kansas; Marci A. Eisenstein, Schiff Hardin & Waite, Chicago, Illinois;
and H. Lee Turner, Turner & Boisseau, Great Bend, Kansas, with her on the
brief), for Appellees, Insurance Companies.

Before **ANDERSON** and **McWILLIAMS**, Circuit Judges, and **COOK**,[*] District Judge.

***

**ANDERSON**, Circuit Judge.

***

Plaintiffs, nineteen chiropractors led by Dr. Mark A. Beck d/b/a Beck Chiropractic Clinics, appeal the district court's grant of summary judgment to defendants, as well as several other adverse rulings, in this antitrust case.[1] Defendants are a group of insurance companies: Farm Bureau Mutual Insurance Company, KFB Insurance Company, Farmers Insurance Company, Mid Century Insurance Company, Shelter Mutual Insurance Company, Shelter General Insurance Company, State Farm Automobile Insurance Company, State Farm Fire & Casualty Company, and Trinity Universal Insurance Company of Kansas ("Insurers"). An additional defendant is Intracorp, a "utilization review company," to which various insurance companies, including the Insurers, submit insurance claims for review.

---

[*]The Honorable H. Dale Cook, United States District Court for the Northern District of Oklahoma, sitting by designation.

[1]Although they filed and pled their case as a class action, plaintiffs have apparently not sought class certification.

Plaintiffs brought this antitrust action against the Insurers and Intracorp, alleging that Intracorp and the Insurers violated § 1 of the Sherman Act, 15 U.S.C. § 1, as well as Kansas antitrust laws, by utilizing Intracorp's insurance review process to fix prices and treatment schedules for chiropractic care provided pursuant to automobile insurance policies issued by the Insurers.[2] We affirm the district court's entry of summary judgment to defendants, as well as its other orders.

## BACKGROUND

Taking the facts as averred by the plaintiffs, and construing all reasonable inferences therefrom in a light most favorable to the plaintiffs, the record reveals the following:

The Insurers write automobile liability insurance policies in Kansas.[3] Under Kansas law, those policies must provide minimum no fault personal injury

---

[2]Plaintiffs also brought claims under RICO and various state laws. Defendants filed motions to dismiss the civil RICO and fraud claims, which the district court denied. After the court granted summary judgment to defendants on the federal antitrust claim, plaintiffs moved to amend their complaint to dismiss the RICO claim. The court granted that motion and, on its own initiative, dismissed the state law claims as well for lack of continued supplemental jurisdiction.

[3]While there are nine named insurance company defendants, some of them are related, so that there are, "functionally speaking," five companies. See Memorandum and Order at 5, Appellants' App. Vol. XIV at 3768.

protection ("PIP") benefits for injuries the insured may sustain in an automobile accident. By statute, PIP benefits are "allowances for all reasonable expenses . . . for necessary health care" for injuries covered by the insurance policy. Kan. Stat. Ann. § 40-3103(k) (1993). Kansas law does not define "reasonable" or "necessary," and insurance companies have the right to challenge the reasonableness and necessity of any claimed benefits or care. This case involves the Insurers' determinations of reasonable and necessary expenses and health care for chiropractic treatment provided as PIP benefits.

Typically, when an insured seeks PIP benefits from one of the Insurers for chiropractic care for injuries sustained in a car accident, the chiropractor accepts a partial assignment of those benefits, provides treatment to the insured, and bills the insurance company for the services rendered. If the Insurer decides to review the claim for reasonableness and necessity, it either conducts the review itself in-house, or uses an outside consultant such as Intracorp. Intracorp is a wholly-owned subsidiary of Connecticut General Corporation which, in turn, is a wholly-owned subsidiary of CIGNA. Intracorp is not itself an insurance company, nor is Connecticut General or CIGNA. CIGNA has approximately one hundred subsidiary corporations, however, some of which are insurance companies.

Intracorp is one of several medical utilization review companies in the Wichita area. Intracorp has provided to the Insurers two types of chiropractic

claim review: retrospective and concurrent. Retrospective review evaluates the necessity and reasonableness of treatment fees after the services have been provided. Concurrent review evaluates the necessity and reasonableness of fees while treatment is on-going, commencing with the initial diagnosis.[4] Plaintiffs challenge both Intracorp's retrospective and concurrent review practices, claiming that the Insurers, through Intracorp's review process, arbitrarily limited costs and reduced the number of treatments allowed for chiropractic care.

Plaintiffs do not specifically allege and document the extent to which each Insurer actually used Intracorp's services, although all the Insurers used Intracorp at some point for at least some of their retrospective reviews, and all but one Insurer used Intracorp at some point for at least some of their concurrent reviews. As the district court found, "[e]ach Insurer contracted with Intracorp at different points in time and for different durations. The fact remains, however, that for at least three continuous years, 1/1989 - 1/1992, all Insurers were contracting with Intracorp for some of their retrospective review services." Memorandum and Order at 9 n.10, Appellants' App. Vol. XIV at 3772.

When retrospectively reviewing the reasonableness of chiropractic claims, Intracorp and State Farm and, beginning in 1992, Farmers, used a fee survey

---

[4]Concurrent review was introduced because it theoretically permits more efficient and economic care by avoiding unnecessary treatments before they are provided. Its success in that regard is, however, unclear.

called "Fee Facts."[5]  Fee Facts is an independent publication which contains information on chiropractic fees throughout the nation, broken down by geographical area and individual procedure.  It lists the fees at or below which 80% of area chiropractors charge, at or below which 90% of area chiropractors charge, as well as the average charge.

Beginning in January 1992, Intracorp began reviewing chiropractic claims submitted to it under a concurrent review program called Targeted Care Review ("TCR").  TCR was a three-level review providing on-going evaluation of a treatment plan.  In implementing TCR, Intracorp utilized a program developed by independent chiropractors and used by Intracorp under license, as well as various of its own internally developed evaluative criteria.  Farmers never used Intracorp's TCR service.  State Farm's use "was minimal and ceased shortly after Intracorp's concurrent review program began." Id. at 7 n.8, Appellants' App. Vol. XIV at 3770.  Shelter used it from January through August 1992.  Trinity and Farm Bureau also utilized TCR to some extent.[6]

---

[5]The district court stated that "[t]here is no evidence regarding which survey, if any, the other Insurers consulted to evaluate the reasonableness of chiropractic claims not referred to Intracorp." Memorandum and Order at 10 n.11, Appellants' App. Vol. XIV at 3773.

[6]As did the district court, we have experienced frustration in attempting to extract relevant facts from the voluminous record in this case.  Plaintiffs at times make global statements about defendants' conduct, but a review of the record citation upon which they rely indicates that the conduct applies to only one

(continued...)

Whether conducting its review concurrently or retrospectively, Intracorp reviewed chiropractic services and charges, identified those which it considered unnecessary and/or unreasonable, and recommended to the particular Insurer the amount to be paid and/or the number of treatments to be allowed. While the evidence does not establish that the Insurers were obligated to follow Intracorp's recommendations, the district court concluded that, "[d]rawing all reasonable inferences in favor of plaintiffs, . . . [the] Insurers almost always followed Intracorp's recommendations." Memorandum and Order at 11, Appellants' App. Vol. XIV at 3774.

With respect to the amounts charged, Intracorp generally recommended that the Insurers not pay chiropractic bills exceeding the eightieth percentile as set forth in Fee Facts. Further, "[a]ll defendants considered chiropractic charges at or below the eightieth percentile of Fee Facts to be reasonable." Id. While charges exceeding that eightieth percentile figure were not considered presumptively reasonable, "Insurers frequently paid above the eightieth percentile

---

[6](...continued)
defendant. For example, in discussing Intracorp's TCR service, plaintiffs state that "[u]nder this program all chiropractic bills were reviewed by Intracorp." Appellants' Br. at 5. The record citations, Appellants' App. Vol. V at 1271-72, Vol. VII at 1833, only support the conclusion that Farm Bureau, for some unspecified period of time, referred all chiropractic claims to Intracorp. The number of chiropractic claims *actually* submitted by Farm Bureau to Intracorp is unclear. Moreover, that particular record citation reveals nothing about any of the Insurers other than Farm Bureau.

on claims reviewed in-house . . . [while] they rarely paid above the eightieth percentile [on claims reviewed by Intracorp]." Id. at 3774-75. However, as the district court pointed out, plaintiffs have not demonstrated the statistical significance of these cost recommendations in that they present no evidence that the Insurers reduced a statistically significant number of claims.

With respect to Intracorp's recommendations regarding treatment schedules, plaintiffs rely heavily on an affidavit prepared by Kathy Barr, a legal assistant employed by plaintiff Beck. The Barr affidavit describes 749 cases of chiropractic claim review, 287 of which were conducted by Intracorp. Ms. Barr does not identify what proportion of all chiropractic reviews this represents, either in terms of all chiropractic reviews conducted by the Insurers, all PIP benefits claims for chiropractic treatment, or all of Intracorp's chiropractic reviews. Ms. Barr reports that 95% of the time, when the actual number of chiropractic visits exceeded thirty, the reviewer recommended that the insurance company cut the number of visits deemed necessary. Barr Aff. at ¶ 14, Appellants' App. Vol. VIII at 2098-99. She also reports that 80% of the time, when the actual treatment duration exceeded three months, the reviewer recommended cutting the duration of treatment. Id. at ¶ 15, Appellants' App. Vol. VIII at 2099. She does not identify how many times Intracorp made that recommendation, although the supporting data shows that all the reviewers

(Intracorp and other independent consultants and internal reviews by Farmers) at times recommended reducing the number of treatments, and not only when the number of treatments exceeded thirty.[7]

The parties presented no evidence on the Insurers' individual or collective market shares for PIP insurance, nor on the "market share of Insurers' PIP insureds for chiropractic care." Memorandum and Order at 5, Appellants' App. Vol. XIV at 3768. Additionally, as noted by the district court, "[t]he record does not reflect (1) the percentage of chiropractic claims selected for review either by each Insurer or by Insurers as a group, (2) out of those selected, the percentage of claims referred to outside companies for review, or (3) the percentage of those referrals sent to Intracorp." Id. at 7, Appellants' App. Vol. XIV at 3770.

With respect to the interaction between the defendant Insurers, the district court found the following facts established:

Leading up to and during the alleged conspiracy, agents of defendants discussed among themselves, in telephone conversations,

----

[7]As the district court observed, "Barr fails to mention a few other interesting points. Insurers refused to pay for at least one visit for 60% of all claims in which the number of visits was thirty or fewer. Insurers cut 76% of all 749 files down to twenty-five or fewer sessions. They cut 56% of all files to twenty or fewer sessions." Memorandum and Order at 15, Appellants' App. Vol. XIV at 3778. Further, "[o]f the 282 patient files indicating more than thirty treatment sessions, Insurers paid for twenty or fewer sessions 33% of the time, twenty-one to twenty-five sessions 26% of the time, twenty-six to thirty sessions 23% of the time, and more than thirty sessions 18% of the time." Id. at 15-16, Appellants' App. Vol. XIV at 3778-79.

through correspondence, at conventions or seminars, and in meetings with the Kansas Insurance Commissioner, their individual procedures for review of chiropractic claims, the merits of Fee Facts, and the universal adoption of a uniform fee schedule that would be acceptable to chiropractors for use in determining whether a chiropractic charge is reasonable. There is no direct testimony or evidence that the agents discussed (1) treatment caps whether termed as schedules, protocols, or otherwise, (2) effecting a general reduction in chiropractic charges (as distinct from reducing insurance company payouts on unnecessary or unreasonable chiropractic claims), (3) uniform use of TCR, (4) uniform adoption of the eightieth percentile of Fee Facts as a price ceiling or as presumptively marking the top end of reasonable rates, (5) establishing a monopoly or oligopoly, (5) (sic) discouraging their insureds from patronizing chiropractors, or (6) (sic) any other restraint of trade.

Plaintiffs have presented no evidence regarding the specific criteria each Insurer employed to determine whether to review a claim. Instead, they have merely presented evidence that a list of suggested referral criteria created by Intracorp was found in each Insurer's files. There is no evidence that any Insurer adopted Intracorp's suggested criteria. Insurers do not appear to deny, however, that the review criteria used by each Insurer contained certain common elements. Although the record is not a model of clarity, Insurers appear to have uniformly used the following referral criteria: (1) more than 26 visits within ninety days in a course of treatment exceeding ninety days, (2) more than two modalities per office visit, (3) x-rays of a larger area of the spine than where the patient described pain, (4) multiple x-rays, (5) treatments considered duplicative, and (6) use of unorthodox treatments, such as thermography.

Memorandum and Order at 12-14, Appellants' App. Vol. XIV at 3775-77

(footnote omitted).

From all of the above facts, plaintiffs derive either an explicit or implicit

agreement among the Insurers and Intracorp to fix prices and treatment schedules

-11-

for chiropractic care, in violation of § 1 of the Sherman Act and the Kansas antitrust laws.[8]  They accordingly brought this action.

Before discovery commenced, the defendants moved for summary judgment on the antitrust claims.  After the summary judgment motions were filed, the court ruled that the initial phase of discovery would be limited to the issue of the existence of an antitrust conspiracy.  Discovery proceeded, and more than seventy witnesses were deposed and thousands of pages of documents were produced.

Terry G. Lee, a former employee of defendant Farmers, was deposed during the course of discovery.  In his deposition, he testified that, with the exception of a July 1991 meeting at the Kansas Insurance Commissioner's office, he never discussed price caps or schedules with any of the Insurers, nor was he aware of any chiropractic treatment frequency cut-off, nor did he attend any meeting, except in July 1991, at the Insurance Commissioner's office where chiropractic bill review was discussed.  After the close of discovery, however, plaintiffs produced an affidavit from Mr. Lee in which he arguably contradicted his deposition, or at least more clearly recalled discussions and meetings where

_____

[8]Both in the district court and on appeal, no one has separately discussed the claims based on Kansas law.  See Memorandum and Order at 3 n.4, Appellants' App. Vol. XIV at 3766.  The district court concluded "that state and federal law are functionally equivalent," and did not separately analyze plaintiffs' claims under state law.  Id.  Like the district court, we conclude that our resolution under federal law adequately disposes of plaintiffs' claims under state law.

pricing and treatment protocols were discussed. Defendants moved to strike the Lee affidavit and the court granted the motion, finding "that the submission of Lee's affidavit represents an attempt to create a sham issue of fact." Memorandum and Order at 2, Appellants' App. Vol. XIV at 3750. Several months into discovery the plaintiffs moved, pursuant to 28 U.S.C. § 455(a)-(b)(2), for the recusal of the district court judge.

After discovery was closed, plaintiffs submitted their brief in opposition to defendants' summary judgment motions. They included therewith a 22-volume appendix consisting of more than 4000 pages of documents and other materials, to which plaintiffs failed to attach an authenticating affidavit. Further briefing ensued, including defendants' objection to plaintiffs' filings in opposition on the ground that they failed to comply with D. Kan. R. 56.1.

After the close of discovery, the district court ruled on the various motions pending before it. It (1) granted the defendants' motion for summary judgment, finding that there was insufficient evidence of the existence of an agreement in violation of the antitrust laws; (2) struck all the documents upon which plaintiffs relied to controvert defendants' summary judgment motions, on the ground that they violated Fed. R. Civ. P. 56 and local Rule 56.1; (3) struck the Lee affidavit; and (4) denied plaintiffs' motion to have the judge recuse.

Plaintiffs appeal, arguing the court erred in (1) striking the Lee affidavit and their documents filed in opposition to defendants' summary judgment motions; (2) finding that plaintiffs failed to demonstrate a factual dispute on the existence of an agreement to restrain trade thereby entitling the defendants to summary judgment; and (3) failing to recuse from this case. We affirm the district court in all respects.

## DISCUSSION

### I. Evidentiary Rulings

Before addressing whether the district court properly granted summary judgment to defendants on plaintiffs' § 1 antitrust claim, we first address the propriety of the court's evidentiary rulings which plaintiffs challenge on appeal. As indicated, the district court struck Mr. Lee's affidavit, as well as plaintiffs' 22-volume unauthenticated appendix filed in opposition to defendants' motion for summary judgment. "Like other evidentiary rulings, we review a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion." Sports Racing Servs., Inc. v. Sports Car Club of America, Inc., 131 F.3d 874, 894 (10th Cir. 1997). We find no abuse in either case.

### A. Mr. Lee's Affidavit

Mr. Lee worked for defendant Farmers for twelve years, from 1982 to 1993. The circumstances of his leaving Farmers, and incidents which have occurred since his departure, make it amply clear why, as the district court observed, "there is no love to be lost between Lee and Farmers." Appellants' App. Vol. XIV at 3753. The district court struck Mr. Lee's affidavit because its submission "represents an attempt to create a sham issue of fact," id. at 3750, and because the court was convinced, after considering Mr. Lee's deposition testimony, that "plaintiffs were deliberately sandbagging defendants," id. at 3759. After carefully reviewing Mr. Lee's deposition and affidavit, as well as the evidence in this case, we agree with the district court. It therefore did not abuse its discretion in striking Mr. Lee's affidavit. See Sports Racing Servs., Inc., 131 F.3d at 894.[9]

---

[9]Were we to consider the Lee affidavit as circumstantial evidence of an antitrust conspiracy, we agree with the Insurers and the district court that the affidavit is unpersuasive because much of it is conclusory, vague, and/or lacking in foundation. A crucial paragraph purporting to state Mr. Lee's personal knowledge of an anticompetitive agreement states that "Farmers and other auto carriers, including State Farm, Kansas Farm Bureau, Shelter and possibly Trinity had an agreement or understanding that we all needed to be using uniform pricing and treatment schedules in paying auto first and third party medical claims." Lee Aff. ¶ 4, Appellants' App. Vol. VIII at 2203-04. Mr. Lee fails to state how he learned of this agreement, who exactly represented the other insurance companies, how he could speak for what they wanted or needed, when this agreement or understanding was formed, and how it was to operate.

## B. Documents in Opposition

In opposition to the Insurers' motion for summary judgment, plaintiffs filed with the district court approximately 4000 pages of documents, consisting of "550 deposition exhibits, and 119 other documents produced during discovery or gathered from sources other than through the formal discovery process." Appellants' Br. at 30. As the plaintiffs concede, "[t]hese documents were submitted to the Court without an authenticating affidavit attached to them." Id. The Insurers did not object to that lack of authentication at that time.

Plaintiffs, perhaps anticipating a challenge to the admissibility of those documents, served on defendants requests for admissions and interrogatories. Certain of the Insurers filed motions for protective orders and the matter was referred to a magistrate judge, who directed all parties to "attempt in good faith to reach stipulations regarding the use of the documents in plaintiffs' response to defendants' motion for summary judgment." Appellants' App. Vol. IV at 1152.

The parties thereafter corresponded among themselves and ultimately reached the following stipulation:

> Each defendant stipulates and agrees not to raise objections in connection with the pending summary judgment motions on the ground of authenticity of documents or on the ground that a document was not maintained by that defendant in the normal course of business as to any documents which (1) were produced by that defendant during the course of discovery in this matter and which bear bates numbers affixed by that defendant, and (2) were authored by an employee of that defendant.

Appellants' App. Vol. XIV at 3860. Plaintiffs did not provide the court with that stipulation until after the court struck their documents, ruling, in the course of granting defendants' summary judgment motions, that the documents failed to comply with Fed. R. Civ. P. 56 and local Rule 56.1.

On appeal, plaintiffs argue the court erred in sua sponte striking their responsive documents for lack of authentication. As the defendants point out, however, the district court struck those documents for several reasons:

> [P]laintiffs (1) failed to "specifically controvert" defendants' statements of facts with denials or counter-statements that fairly met the substance of defendants' statements, (2) failed to support many of their facts with adequate citations to the record, (3) intermixed their responses and their own statements of "facts" with legal arguments and asserted inferences to be drawn from the facts, (4) mischaracterized much of the evidence, and (5) failed to present much of their documentary evidence in an admissible form.

Memorandum and Order at 4, Appellants' App. Vol. XIV at 3767. Thus, it is clear, as defendants argue, that the failure to authenticate the 4000 pages of documents was but one ground for striking them. The documents also wholly failed to comply with the requirement that they specifically controvert the defendants' fact statements with adequate and accurate record support. Indeed, the district court's order denying plaintiffs' motion to reconsider its summary judgment ruling makes it clear that a different resolution of the authentication

issue would not have changed the court's ultimate decision to grant judgment to defendants.[10]

We therefore affirm the district court's order striking plaintiffs' responsive documents, and deeming the Insurers' and Intracorp's fact statements uncontroverted for summary judgment purposes. We now turn to the propriety of the court's grant of summary judgment.[11]

## II.    Summary Judgment

We review the grant of summary judgment de novo, applying the same standard as did the district court. Sports Racing Servs., Inc., 131 F.3d at 882. Thus, summary judgment is proper "'if the pleadings, depositions, answers to

---

[10]As the court stated, "[c]onsideration of the struck papers would have made no difference in the court's resolution of any issue in light of the court's other rulings on plaintiffs' presentation of the facts." Appellants' App. Vol. XIV at 3864.

[11]Technically, having affirmed the district court's decision to strike plaintiffs' responsive documents, we could simply affirm summary judgment to defendants on the ground that plaintiffs have failed to controvert defendants' evidence demonstrating the absence of an antitrust conspiracy. See Universal Money Centers, Inc. v. American Tel. & Tel. Co., 22 F.3d 1527, 1529 (10th Cir. 1994) (noting that once the moving party carries its initial burden to show the absence of an issue of genuine fact, non-moving party may not rest on allegations in pleadings, but "'must set forth specific facts showing that there is a genuine issue for trial'" (quoting Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990)). However, like the district court, we alternatively address the merits of the grant of summary judgment, on the assumption that plaintiffs at least attempted to controvert defendants' averments.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Law v. NCAA, 134 F.3d 1010, 1016 (10th Cir.) (quoting Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996)), cert. denied, 119 S. Ct. 65 (1998). Plaintiffs have alleged that the Insurers and Intracorp, through various fee and treatment review services utilized by Intracorp and by the Insurers, agreed to fix prices and treatment schedules and protocols for chiropractic treatment.

Section 1 of the Sherman Act "forbids agreements in restraint of trade." SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 962 (10th Cir. 1994). While § 1 generally forbids only "unreasonable" agreements, certain practices, like price-fixing, "are entirely void of redeeming competitive rationales" and are therefore deemed "per se illegal under section 1." Id. at 963; see also Law, 134 F.3d at 1017. Other agreements alleged to restrain trade are analyzed under a "rule of reason." Law, 134 F.3d at 1016-17. Accordingly, to survive defendants' motion for summary judgment, the plaintiffs must first demonstrate the existence of an agreement, whether by direct or by circumstantial evidence. See Cayman Exploration Corp. v. United Gas Pipeline Co., 873 F.2d 1357, 1361 (10th Cir. 1989).

## A.    Direct Evidence

The plaintiffs make several arguments concerning direct evidence of the existence of an agreement: first, they rely upon Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), to argue that, by virtue of its insurance company sibling subsidiaries and/or its parent CIGNA, we should view Intracorp as an insurance company for antitrust purposes, such that its alleged agreements with the Insurers to review chiropractic charges constitute a horizontal agreement in restraint of trade, per se illegal under § 1; second, they argue that, should we not view Intracorp as a horizontal competitor of the Insurers, but rather an independent third party consultant, there is nonetheless sufficient evidence that it agreed with the Insurers to restrain trade; and third, they argue there is direct evidence of an agreement directly between the Insurers. We reject all these arguments.

### 1.    Intracorp as an Insurer under Copperweld

The Court held in Copperweld that a parent corporation and its wholly owned subsidiary could not "conspire" within the meaning of § 1: "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." Copperweld, 467 U.S. at 771. This is so because "[a] parent and its wholly

-20-

owned subsidiary have a complete unity of interest[, and t]heir objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." Id.

Plaintiffs wish to extend Copperweld to hold that a subsidiary and its parent, or a subsidiary and a sister subsidiary, can be considered one entity for all § 1 purposes, and either one can be liable for conspiring to restrain trade, even where there is no evidence that both were involved in the challenged conduct. We reject this extension. Despite Copperweld's expansive language about the economic unity of a parent and subsidiary, the Court held only that "the coordinated activity" of a parent and subsidiary must be viewed as that of a single enterprise for § 1 purposes. Id. (emphasis added). Like the district court, echoing the sentiments of another district court, we decline to be the first court to interpret Copperweld dicta in the expansive way plaintiffs wish. See Bellsouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc., 719 F. Supp. 1551, 1568 (S.D. Fla. 1988), rev'd on other grounds, 999 F.2d 1436 (11th Cir. 1993). In the absence of any specific evidence of coordinated activity, we will not consider Intracorp as an insurance company on the same horizontal level as the Insurers merely because it

happens to be the wholly owned subsidiary of a company, CIGNA, which owns

other subsidiaries which are insurance companies.[12]


## 2. Intracorp as Consultant

Plaintiffs also argue that, even if we do not view Intracorp as a horizontal

competitor of the Insurers (i.e., in reality another insurance company), the

agreements between it and the Insurers to provide medical utilization reviews

constitute the requisite § 1 agreements. We reject this argument. Absent some

indication that these agreements have facilitated a conspiracy among the Insurers

to restrain trade, we do not conclude that, standing alone, these individual

agreements for Intracorp to review the reasonableness of fees charged are

unlawful under § 1. See Quality Auto Body, Inc. v. Allstate Ins. Co., 660 F.2d

1195, 1203 (7th Cir. 1981) (holding that agreements between insurance companies

and auto repair shops to perform repairs at prevailing competitive rate did not

_____

[12]Plaintiffs characterize CIGNA as a "giant insurance conglomerate." Appellants' Br. at 15. Plaintiffs further assert that "there was abundant evidence of a concerted effort by CIGNA to ensure that Intracorp was furthering the purposes of CIGNA and its insurance company subsidiaries." Id. at 21. However, as Intracorp points out, that "abundant evidence" consists of various facts, or circumstances, which are typical of any parent and subsidiary. Our review of the record, as illuminated by plaintiffs' record citations, fully supports the district court's conclusion that "[t]here is no evidence of any involvement by Intracorp's parent or sister corporations in this case [and t]here is no evidence that Intracorp is merely the alter ego of its parent or sister corporations." Memorandum and Order at 26, Appellants' App. Vol. XIV at 3789.

alone violate antitrust laws). As we discuss below, plaintiffs fail to demonstrate that there is any factual dispute about the existence of any illegal agreement so as to preclude granting defendants summary judgment.

### 3. Agreement Between Insurers

Plaintiffs also argue there is direct evidence of an agreement between the Insurers to fix prices and treatment schedules. Before the district court, plaintiffs argued that Mr. Lee's affidavit, "the statement of Farmers' and Intracorp's attorneys in connection with state court proceedings," and "the testimony of Barbara Peters" substantiate their claim of direct evidence of an agreement. Memorandum and Order at 26, Appellants' App. Vol. XIV at 3789 (citing Doc. 401 at 34). On appeal, they argue only that Mr. Lee's affidavit constitutes direct evidence justifying the denial of summary judgment. We have affirmed the court's decision to strike Mr. Lee's affidavit. We discern no other relevant evidence from the record. We accordingly affirm the district court's determination that plaintiffs proffered insufficient direct evidence of an agreement to warrant a denial of summary judgment to defendants.

**B. Circumstantial Evidence**

Plaintiffs further argue that they presented sufficient circumstantial evidence of an agreement between the Insurers so as to avoid summary judgment. The district court held they did not, and we agree.

Circumstantial evidence may support the existence of an illegal § 1 agreement. Cayman Exploration Corp., 873 F.2d at 1361. However, on summary judgment, antitrust law "limits the range of permissible inferences from ambiguous evidence in a § 1 case." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). "To survive a motion for summary judgment . . . , a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." Id. at 588 (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)); see also Coffey v. Healthtrust, Inc., 955 F.2d 1388, 1391 (10th Cir. 1992). Thus, "[t]he acceptable inferences which we can draw from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the danger associated with such inferences." In re Baby Food Antitrust Litig., 166 F.3d 112, 124 (3d Cir. 1999). As we have observed, "ambiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy under Sherman Act section 1."

Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publications, Inc., 63 F.3d 1540, 1556 (10th Cir. 1995).

Plaintiffs argue that "the facts showing the consistency of behavior by the insurer defendants, coupled with the facts showing that the reviews by Intracorp were performed on a consistent basis, demonstrates [sic] a consistency of action sufficient to support a circumstantial case for the existence of an agreement." Appellants' Reply Br. at 8. While consciously parallel behavior may contribute to a finding of antitrust conspiracy, it is insufficient, standing alone, to prove conspiracy. Cayman Exploration Corp., 873 F.2d at 1361. Such parallel behavior may, however, support the existence of an illegal agreement "when augmented by 'additional evidence from which an understanding among the parties may be inferred.' Such evidence may include a showing that the parties 'are acting against their own individual business interests, or that there is motivation to enter into an agreement requiring parallel behavior.'" Monument Builders of Greater Kansas City, Inc. v. American Cemetery Ass'n of Kansas, 891 F.2d 1473, 1481 (10th Cir. 1989) (quoting 2 J. Von Kalinowski, Antitrust Laws & Trade Regulation § 6.01[3][a][ii], at 6-36 to 6-37 (1989)); see also In re Baby Food Antitrust Litig., 166 F.3d at 122 (noting that courts require "plus factors," which are "'the additional facts or factors required to be proved as a prerequisite to finding that parallel action amounts to a conspiracy'" (quoting Phillip Areeda,

-25-

Antitrust Law ¶ 1433(e) (1986)). Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange. See In re Baby Food Antitrust Litig., 166 F.3d 112, 118 (3d Cir. 1999); United States v. Suntar Roofing, Inc., 897 F.2d 469, 475 (10th Cir. 1990).

The district court held, after carefully examining all the record evidence upon which plaintiffs rely, that "[t]he evidence demonstrates parallel conduct among all five Insurers only with respect to their common use of Intracorp for retrospective review of chiropractic claims, using the eightieth percentile of Fee Facts as the presumptive measure of reasonableness, from 1989 to 1992." Memorandum and Order at 28, Appellants' App. Vol. XIV at 3791. It further found that that parallel conduct failed to support the inference of conspiracy, because plaintiffs failed to demonstrate that defendants had a motive to conspire or that they acted interdependently. We agree.

First, we agree with the district court that Intracorp clearly is entitled to summary judgment, as plaintiffs do not even seriously attempt to articulate Intracorp's motive or necessity to conspire with the Insurers to reduce the cost and frequency of chiropractic treatments provided by the Insurers as PIP benefits.

-26-

We further agree that plaintiffs fail to demonstrate why the Insurers also should not prevail on summary judgment. Plaintiffs argue they have advanced a plausible economic theory for the claimed conspiracy, in that the Insurers desired to "[s]tabilize [p]rices and [c]ut [c]osts." Appellants' Br. at 38. They also assert that the Insurers would be motivated to act jointly by a fear that an individual Insurer attempting to lower costs would risk losing clientele because chiropractors would refuse to treat that Insurer's patrons. Finally, plaintiffs argue the Insurers would be motivated to act jointly because they could more easily defend bad faith refusal-to-pay claims by asserting conformity to industry practice. We agree with the district court that plaintiffs' theories are unsupported by the evidence.

Plaintiffs' posited economic theory—that the Insurers are motivated to conspire in order to reduce costs and stabilize prices—is based largely on a purported agreement to cap chiropractic fees at 80% under Fee Facts (representing the figure at or below which 80% of area chiropractors charge for a particular procedure). While perhaps sounding initially appealing, the evidence shows this agreement would make little economic sense from the Insurers' perspective. Indeed, it would as likely result in <u>increased</u> costs for the Insurers, as chiropractors charging less than the 80% fee would be inclined to raise their

fees to that level, if that is what all the Insurers were willing to pay, and

plaintiffs' evidence in fact suggests just that.[13]

With respect to the argument that the Insurers feared unilateral action

would cause them to lose clients, as well as the argument that the Insurers were

motivated to act jointly because of concerns about bad faith litigation, we agree

with and adopt the district court's analysis and assessment of both the evidence,

which we have independently reviewed, and the law.

Finally, plaintiffs' failure to place the asserted instances of cost and

treatment cuts in a larger economic context renders plaintiffs' claimed conspiracy

entirely speculative. We have carefully reviewed every piece of evidence cited to

us by plaintiffs as circumstantially indicative of the existence of an agreement

between the Insurers and/or Intracorp. At most, they show that the Insurers

shared a common concern about chiropractic cost containment, and that, at times,

some of them shared information about how each one individually handled

chiropractic claims and that, at times, the Insurers used Intracorp to review

---

[13]In support of this argument, plaintiffs rely upon a chart showing the average cost, the 80% cost and the 90% cost for one chiropractic procedure. Appellants' App. Vol. VI at 1445. Aside from the fact that this chart relates to only one chiropractic procedure, which makes extrapolations about all chiropractic procedures difficult, it also in fact shows an increase in the average cost of that procedure from 1990 through 1993, as well as increases in the 80% and 90% figures. This hardly supports the inference that the Insurers were engaged in a conspiracy to reduce costs.

chiropractic claims. Under Matsushita, plaintiffs have simply failed to present evidence tending to exclude the possibility that the defendants acted independently out of a legitimate and reasonable concern to control chiropractic costs.

We therefore hold that plaintiffs have presented neither direct nor circumstantial evidence sufficient to withstand defendants' motions for summary judgment. We affirm the district court's grant of summary judgment on plaintiffs' antitrust claims.

III. **Recusal**

Plaintiffs filed a motion seeking Judge Belot's recusal from this case. They argue that "in light of the nature of the claims, the time period covered by the claims, and the fact that the judge, prior to assuming the bench, had an extensive insurance defense practice, had represented some of the defendants, and had worked with some of the defense witnesses in the past created a situation in which the judge's impartiality might reasonably be questioned." Appellants' Br. at 45. We review the denial of a motion for recusal for an abuse of discretion. Cauthon v. Rogers, 116 F.3d 1334, 1336 (10th Cir. 1997). We find no abuse in this case.

28 U.S.C. § 455(a) provides for the disqualification of a judge "in any proceeding in which his impartiality might reasonably be questioned." Section 455(b)(1) provides for disqualification "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Finally, § 455(b)(2) provides for disqualification "[w]here in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter . . . ." Plaintiffs initially sought Judge Belot's recusal under all three provisions. As the district court found, plaintiffs presented no evidence even suggesting that the judge had any personal bias or prejudice under § 455(b)(1) or that the judge or a lawyer with whom he was previously associated served as counsel in the matter in controversy under § 455(b)(2).[14] Thus, they are left with their claim of recusal under § 455(a).

Under § 455(a), "a judge has a continuing duty to recuse before, during, or, in some circumstances, after a proceeding, if the judge concludes that sufficient factual grounds exist to cause an objective observer reasonably to question the judge's impartiality." United States v. Cooley, 1 F.3d 985, 992 (10th Cir. 1993). The crux of plaintiffs' complaint about Judge Belot is that, prior to becoming a

_____

[14]At the hearing on plaintiffs' motion to recuse, one of plaintiffs' counsel conceded that they were not arguing any personal bias or prejudice on the part of Judge Belot.

judge, he had represented some of the defendant Insurers, or at least represented some of their insureds, and that his former partner had been selected in 1987 as one of State Farm's defense attorneys for chiropractic claims. We agree with the district court that that is insufficient to require recusal under § 455.

Included in the non-exclusive list of matters ordinarily insufficient to justify recusal are "mere familiarity with the defendant(s), or the type of charge, or kind of defense presented." Nichols v. Alley, 71 F.3d 347, 351 (10th Cir. 1995) (quoting Cooley, 1 F.3d at 994). Reduced to its essence, that is what plaintiffs argue should cause Judge Belot to recuse from this case—familiarity with insurance defense work. Plaintiffs concede that "[t]he fact that Judge Belot represented two of the defendants in unrelated matters would not automatically require him to recuse himself." Appellants' Br. at 47. We agree with the district court that Judge Belot was also not obligated under § 455(a) to recuse himself from this case because he and/or his former partner had represented insurance companies in other insurance-related litigation.[15]

_____

[15]Plaintiffs suggest that Judge Belot's or his former partner's prior representation of insurance companies may not have been "unrelated" to this case. "The actions taken may well have been part of the overall strategy of some of the insurers to cap chiropractic reimbursement rates." Appellants' Br. at 48. That is pure speculation; there is absolutely no evidence connecting any prior litigation involving Judge Belot or his former partner and this case.

-31-

## CONCLUSION

For the foregoing reasons, the judgment and orders of the district court are AFFIRMED.